Nicholas D. ANDREWS, Appellant

v.

CROSS ATLANTIC CAPITAL PARTNERS, INC.

Nicholas D. Andrews, Appellant

v.

Donald R. Caldwell

Nicholas D. Andrews

v.

Cross Atlantic Capital Partners, Inc., Appellant

Nicholas D. Andrews

v.

Donald R. Caldwell, Appellant

Nicholas D. Andrews, Appellant

v.

Cross Atlantic Capital Partners, Inc.

Nicholas D. Andrews, Appellant

v.

Donald R. Caldwell

No. 1694 EDA 2014
No. 1825 EDA 2014
No. 1934 EDA 2014

Superior Court of Pennsylvania.

Argued August 2, 2016

Filed: March 21, 2017

Abraham C. Reich, Philadelphia, for appellant.

Patrick J. O'Connor, West Conshohocken, for appellee.

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, J., PANELLA, J., SHOGAN, J., LAZARUS, J., OLSON, J., OTT, J., and DUBOW, J.

OPINION BY LAZARUS, J.:

Cross Atlantic Capital Partners, Inc., and Donald R. Caldwell[1] (collectively Defendants) appeal and Nicholas D. Andrews (Andrews) cross-appeals from the judgment, entered in the Court of Common Pleas of Chester County, following a jury verdict in favor of Andrews in the amount of $742,221.45[2] in damages, $216,268.75 in prejudgment interest, and $303,127.50 in attorneys' fees under the Wage Payment and Collection Law (WPCL).[3] After careful review, we affirm in part, reverse in part and remand for calculation of liquidated damages.

We take the underlying facts and procedural history in this matter from the trial court's prior opinions and our review of the certified record.

Cross Atlantic is a corporation in the business of recruiting individual investors, institutional investors, and mutual fund managers who are seeking investment opportunities. These investors enter into a partnership agreement with Cross Atlantic[,] who holds the investors' funds and then uses those funds to

---

1. At all relevant times, Caldwell was the Chief Executive Officer (CEO) for Cross Atlantic, exercising the company's business decisions.

2. This figure represents 1% of the aggregate proceeds returned to the fund as a result of its sales of shares in GAIN between 2006 and 2013.

3. 43 P.S. §§ 260.1–260.12.

invest in start-up companies. The partnership agreement between Cross Atlantic and the investors states how to disburse the investors' funds, any returns, fees, costs, etc., including the payment of any management fees due to Cross Atlantic.

Andrews worked for Cross Atlantic from the summer of 1999 through the summer of 2000. Cross Atlantic's [President] at the time, Glenn Rieger, hired Andrews to find, negotiate, and manage investments for Cross Atlantic. The ultimate goal was to sell the investments at a price that was sufficient to repay the investors their funds and to allow both the investors and Cross Atlantic to realize a profit. During his employment with Cross Atlantic, Andrews did not have a written employment agreement, as is customary in the industry. Compensation is deferred until the investment funds become sufficiently profitable to make corporate distributions. However, Andrews'[ ] employment ended before his funds made any corporate distributions. Therefore, on July 5, 2000, the parties entered into the [s]eparation [a]greement. Paragraph 5 of the [s]eparation [a]greement ("[p]aragraph 5") stated how and when Andrews was to be compensated.

Trial Court Opinion, 1/16/15, at 2–3. Paragraph 5 of the parties' agreement states:

> By the end of this Severance Period, you will have vested one year of service towards 1.0% of carried interest[4] in Cross Atlantic Technology Fund, L.P. and 0.5% carried interest in The Co–Investment 2000 Fund, L.P. Therefore, you will receive 0.2% and 0.1% carried interest as your earned and vested carry in Cross Atlantic Technology Fund, L.P. and The Co–Investment 2000 Fund, L.P., respectively. In addition, as spe-
> cial consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds. Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.

Andrews/Cross Atlantic Separation Agreement ("Agreement"), 7/5/00, at ¶ 5 (emphasis added). In exchange for the benefits under the separation agreement, Andrews agreed to enter into one-year non-compete and non-solicitation agreements, as well as a release of any claims he might have against Cross Atlantic. Cross Atlantic paid Andrews' three months of additional salary, as per the Agreement, as well as a bonus, and continued Andrews' health care and dental benefits for an additional three months.

On September 3, 2003, Andrews read a press release indicating that a number of GAIN shareholders had sold a significant portion of their shares. The following day, Andrews sent Cross Atlantic's Chief Financial Officer (CFO) Brian Adamsky an email asking whether the Technology Fund was among those shareholders. Adamsky emailed Cross Atlantic's President, Glenn Rieger, about Andrews' query and told him to respond to Andrews. Over the next few days, an email exchange occurred between Andrews and Rieger. Rieger ultimately told Andrews that the Technology Fund had sold $1.1 million worth of its shares in GAIN and, that under the Agreement, Andrews was not entitled to any compensation.

---

4. Carried interest is an interest in the profits of a fund.

In February 2011, after he had repeatedly asked Defendants about information on the status of GAIN and Cross Atlantic, Andrews received an email from Adamsky providing him with the requested financial data. On September 2, 2011, Andrews filed two separate complaints,[5] one against Cross Atlantic for breach of contract and violations of the WPCL, and one against Caldwell, personally, under the WPCL. Defendants specifically denied that any distributions or other transactions had been made to investors that would trigger payment to Andrews under paragraph 5 of the Agreement. *See* Defendants' Answer with New Matter, 10/14/11, at ¶ 9. Defendants also raised, among other legal theories, the statute of limitations as a defense to the action, claiming that Andrews "knew or should have known that he had the claims asserted in the Complaint against Defendant[s] several years ago." *Id.* at ¶ 32.

In August 2013, the court held a five-day jury trial. After Andrews rested his case, the trial court granted Defendants' motion for nonsuit as to the payment that became due in September 2003, finding that the applicable statute of limitations barred Andrews' right to recover. However, the court denied Defendants' motion for nonsuit as to payments due after 2003.

Following trial, the jury returned a verdict in favor of Andrews,[6] finding Cross

---

5. Plaintiff Andrews sued Cross Atlantic and Caldwell separately. On January 9, 2012, upon Andrews' uncontested motion to consolidate actions, the court consolidated the actions at 2011–09776–CT and 2011–06164–CT.

6. The verdict slip specifically noted the following determinations by the jury:

Cross Atlantic breached its Agreement with Andrews; (2) the four (4) year statute of limitations on Andrews' breach of contract claim for distributions made on April 4, 2006, was tolled by the discovery rule; (3) Andrews did not know or should not have known that he had a breach of contract action for the April 4, 2006 distribution on or before June 2, 2007; (4) Andrews incurred $100,000.04 in damages as a result of Cross Atlantic's breach of the Agreement at the time of the April 4, 2006 distribution; (5) Andrews incurred $424,336.51 in damages as a result of Cross Atlantic's breach of the Agreement at the time of the January 14, 2008 distribution; (6) Andrews incurred $149,936.16 in damages as a result of Cross Atlantic's breach of the Agreement at the time of the December 21, 2010 distribution; (7) Andrews incurred $ 36,664.51 in damages as a result of Cross Atlantic's breach of the Agreement at the time of the March 15, 2012 distribution; (8) Andrews incurred $ 31,284.23 in damages as a result of Cross Atlantic's breach of the Agreement at the time of the February 13, 2013 distribution; (9) Cross Atlantic violated the WPCL; (10) the three (3) year statute of limitations on Andrews' WPCL claim against Cross Atlantic for the distribution on April 4, 2006, was tolled by the discovery rule; (11) Andrews did not know or should not have known that he had a WPCL claim against Cross Atlantic for the April 4, 2006 distribution on or before June 2, 2008; (12) the three (3) year statute of limitations on Andrews' WPCL claim against Cross Atlantic for the distribution on January 14, 2008, was tolled by the discovery rule; (13) Andrews did not know or should not have known that he had a WPCL claim against Cross Atlantic for the January 14, 2008 distribution on or before June 2, 2008; (14) **Cross Atlantic did not act in good faith when it did not distribute money to [Andrews] pursuant to the Agreement between the parties;** (15) Caldwell directly participated in the decision to withhold payment from Andrews in violation of the WPCL; (16) the three (3) year statute of limitations on Andrews' WPCL claim against Caldwell for the distribution on April 4, 2006, was tolled by the discovery rule; (17) Andrews did not know or should not have known that he had a WPCL claim against Caldwell for the April 4, 2006 distribution on or before September 1, 2008; (18) the three (3) year statute of limitations on Andrews' WPCL claim against Caldwell for the distribution made on January 14, 2008, was tolled by the discovery rule; (19) Andrews did not know or should not have known that he had a WPCL claim against

Atlantic breached the parties' separation agreement and awarding him $742,221.45 in damages[7] under the WPCL.[8] The verdict included a finding that Defendants did not act in good faith when they failed to distribute Andrews' severance pay according to the Agreement. Jury Verdict Slip, 8/30/13, at 6, 8. On September 9, 2013, Defendants filed a joint post-trial motion; that same day, Andrews filed a motion to mold the verdict to include pre-judgment interest, post-judgment interest, and liquidated damages under section 260.10 of the WPCL. Andrews also filed a petition for attorneys' fees and costs in connection with his successful WPCL claims.

On December 19, 2013, the trial court denied Defendants' post-trial motions and granted Andrews' motion in part, awarding him pre-judgment interest in the amount of $216,268.75, and denied the motion in part with respect to his request for liquidated damages. The court denied, without prejudice, Andrews' request for post-judgment interest. On May 5, 2014, the trial court granted Andrews' request for attorneys' fees, awarding him $303,127.50, but denied his request for expert fees and out-of-pocket costs. On May 22, 2014, the Prothonotary entered judgment on the jury's verdict. *See* Pa.R.C.P. 227.4.

On June 3, 2014, Andrews filed a notice of appeal from the court's May 5, 2014 order denying his petition for expert fees and out-of-pocket costs under the WPCL. On June 18, 2014, Defendants filed a notice of appeal from the August 30, 2013 jury verdict, the court's December 19, 2013 order denying their post-trial motions and granting Andrews' petition for prejudgment interest, the court's May 5, 2014 order awarding Andrews' attorneys' fees, and the court's final May 22, 2014 judgment.[9] On June 25, 2014, Andrews filed a notice of cross-appeal challenging the court's May 5, 2014 order as well as the court's December 19, 2013 order denying his request for liquidated damages. This appeal and cross-appeal follow.

On appeal, Defendants raise the following issues for our consideration:

(1) Did [D]efendants' absolute and unequivocal repudiation of its alleged obligations under a separation agreement start the accrual of the limitations period on [P]laintiff's entire cause of action under the agreement, including for future payments allegedly due under the agreement?

(2) Did payments that allegedly became due to plaintiff under a separation agreement negotiated and

---

Caldwell for the January 14, 2008 distribution on or before September 1, 2008; and (20) **Caldwell did not act in good faith when he made a decision that Cross Atlantic should not distribute money to Andrews pursuant to the parties' Agreement.**
Jury Verdict Slip, 8/30/13, at 1–8 (emphasis added).

7. The parties do not dispute that severance pay is considered "wages" under the WPCL.

8. The damages represent failure to pay Andrews on the following dates for the following amounts:

- April 4, 2006 ($100,000);
- January 14, 2008 ($424,336.51);

- December 21, 2010 ($149,936.16);
- March 15, 2012 ($36,664.51);
- February 13, 2013 ($31,284.23).

Instantly, the trial court concluded that Andrews' cause of action accrued, for purposes of application of the statute of limitations, "at the time performance is due or when it is discovered the performance was due, not when the possibility of a future breach is known." Trial Court Opinion, 1/16/15, at 11. It was Defendants' failure to pay Andrews after each separate corporate distribution that gave rise to his claims and required a separate limitations period calculation.

9. *See* Pa.R.A.P. 341(b) (final judgment for purposes of appeal is one that disposes of all claims and of all parties).

executed two months after the termination of [P]laintiff's employment; that were not earned by [P]laintiff during his employment; and that were allegedly given to [P]laintiff in exchange for entering into a non-compete agreement, constitute "wages" under Pennsylvania's Wage Payment and Collection Law?

(3) Was [P]laintiff's interpretation of paragraph 5 of the separation agreement unreasonable as a matter of law when, among other things, his interpretation was irreconcilable with the paragraph's last sentence, required the assignment of two different meanings to the same term, and was inconsistent with the very relief he sought?

## Defendants' Appeal

In their first issue on appeal, Defendants claim that the trial court improperly denied their motion for nonsuit because Andrews' entire cause of action was barred by the statute of limitations. Specifically, Defendants assert that because they had "absolutely and unequivocally repudiated" their contractual obligations under the Agreement in September 2003, and, consequently, would never agree to pay Andrews any "deal specific" carried interest, Andrews could have brought suit for breach of contract at that time.

 We find this claim waived. In their Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal, Defendants fail to list the legal theory of "absolute and unequivocal repudiation" of the parties' Agreement in support of their statute of limitations argument. As a result, the trial court did not address this claim in its Rule 1925(a) opinion. While Defendants did include this issue in their post-trial motion, our appellate rules are clear that "[i]ssues not included in the [Rule 1925(b)] Statement . . . are waived." Pa.R.A.P. 1925(b)(iv).[10]

**10.** The dissent asserts that Defendants "preserved th[e] defense [of the statute of limitations] at every stage of the proceeding" by raising the defense in their answer, motion for summary judgment, and motions for nonsuit and a directed verdict. Dissenting Opinion at 140–42. While the jury was instructed on the defense of statute of limitations, *see* Pa.S.S.I (Civ.) 11.10, and the jury's verdict slip did ask "whether the four (4) year statute of limitations on Plaintiff's breach of contract claim, for the distribution made on April 4, 2006, was tolled or stopped running by the operation of the discovery rule," and "whether Plaintiff knew or should have known he had a breach of contract claim for the April 4, 2006 distribution on or before June 2, 2007," the legal theory proffered by this statute of limitations defense that was put before the jury was not that of anticipatory repudiation. *See McClelland v. New Amsterdam Casualty Co.*, 322 Pa. 429, 185 A. 198, 200 (1936) (anticipatory breach is "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so. If the promisor makes a definite statement to the promisee that he either will not or cannot perform his contract, that is a repudiation and will operate as an anticipatory breach unless the promisor had some justifying cause for his statement.").

Rather, the Defendants raised the defense of statute of limitations based upon their claim that there was an *actual* breach of the separation agreement on September 9, 2003, when Andrews wrote his email to Defendants regarding distribution payments he sought under paragraph 5 of the Separation Agreement. *See* N.T. Jury Trial, 8/30/13, at 4 (when moving for a directed verdict, Defendants' attorney states "It was not just anticipatory. It was an actual breach in the amount of $11,000, that he knew—knew about."); N.T. Jury Trial, 8/28/13, at 74 (Defendants' attorney acknowledges that "this wasn't just an anticipatory breach saying we are not going to honor you or your agreement in the future, there was an actual breach right then and there under his interpretation. . . . [O]nce you know you are not getting a benefit, that is when the statute of limitations starts to run. He knew in September of 2003 that he wasn't

■ However, even if we were to find this claim preserved on appeal, Defendants would not be entitled to relief. Under Pennsylvania law, anticipatory repudiation or breach requires "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *Harrison v. Cabot Oil & Gas Corp.*, 631 Pa. 268, 110 A.3d 178, 184 (2015) (quoting *McClelland, supra* at 200). Here, the trial court recognized that the parties disagreed over the interpretation of paragraph 5 of the Agreement. In fact, in their Rule 1925(b) statement, Defendants aver that "[t]he evidence established that Defendants had *an honest disagreement* with Plaintiff's interpretation of the third sentence of paragraph 5 of the Separation Agreement[.]" Defendants' Rule 1925(b) Statement, 7/15/14, at 7 ¶ (4)(a). We fail to equate an honest disagreement over the language of an agreement with an "absolute and unequivocal refusal to perform." *See Restatement of Contracts, Second*, § 250 (Comment (b)) ("[R]epudiation is a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach[.]").

■ In their next claim on appeal, Defendants assert that any monies promised to Andrews under the parties' Agreement were not compensation for employment but, rather, consideration for agreeing to enter into a non-compete agreement. Therefore, Defendants claim that this amount is not considered "wages"[11] that Andrews earned while employed by Defendants and, as a result, his WPCL claim must fail. We find this claim waived as well.

At trial and in their post-trial motions, Defendants put forth a different legal argument to support their claim that the monies owed under the Agreement were not considered "wages" under the WPCL. Specifically, at trial and post-trial, Defendants posited that the payments due under the Agreement were not an obligation of Cross Atlantic, but rather monies that would come from Andrews' carried interest in the Fund itself. Therefore, because the payments were not coming from his employer, they are not wages under the WPCL. *See* 43 Pa.C.S.A. § 260.3 (under WPCL every *employer* is required to pay wages within certain periods of time).

Because Defendants' argument on appeal advances a different legal theory than that offered at trial and post-trial, we find this claim waived on appeal. *See Estate of Witthoeft v. Kiskaddon*, 557 Pa. 340, 733 A.2d 623, 630 n.8 (1999) (holding that appellant waived legal theory raised for first time on appeal to Superior Court); *see also* Pa.R.A.P. 302.

■ In their final claim on appeal, Defendants contend that Andrews' interpretation of the "carried interest" language in the third sentence of paragraph 5 of the Agreement (as it relates to GAIN) is internally inconsistent with both the term as used in the rest of the paragraph and the relief he sought. Specifically, Defendants disagree with Andrews' testimony that the

getting this benefit, but he didn't do anything about it. So his claim is barred by the statute."). Because one cannot raise a new legal theory on appeal, this claim is waived. *See Steiner v. Markel*, 600 Pa. 515, 968 A.2d 1253, 1257–58 (2009); Pa.R.A.P. 302.

11. Wages are defined, under the WPCL as:
[A]ll earnings of an employe[e], regardless of whether determined on time, task, piece,

commission or other method of calculation. The term "wages" also includes fringe benefits or wage supplements whether payable by the employer from his funds or from amounts withheld from the employe[e's] pay by the employer.
43 Pa.C.S.A. § 260.2a.

parties intended the carried interest in GAIN to differ from the Fund-leveled carried interests.

"[T]he interpretation of the terms of a contract is a question of law for which our standard of review is de novo, and our scope of review is plenary." *McMullen v. Kutz*, 603 Pa. 602, 985 A.2d 769, 773 (2009) (citation omitted). Furthermore, it is well-established that:

> [w]hen the parties have reduced their agreement to writing, the writing is to be taken to be the final expression of their intention. Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention. In determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract do not assume that its language was chosen carelessly. Neither can it be assumed that the parties were ignorant of the meaning of the language employed.

*Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982) (citations and quotation marks omitted). Moreover,

> [c]ontractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. That is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. A court will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.

*Madison Construction Co. v. The Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999).

Defendants claim that the trial court erroneously concluded that the Agreement's language was ambiguous on its face and that "the phrase 'carried interest'[ [12]] in sentence 3 could mean either carried interest in its usual sense or 'deal-specific' carried interest in GAIN." Defendants' Substituted En Banc Brief, at 58. Defendants contend that under the Agreement they would never pay Andrews *deal-specific* carried interest, but that they "left open the possibility that it might one day pay Andrews a different kind of carried interest (that is, fund-level carried interest)." [13] *Id.* at 47.

---

12. Carried interest represents a share in the residual claim on a private equity fund's distributions after the return of invested capital and the payment of management fees and accrued preferred returns. *See* http://www.srr.com/article/carried-interest-and-performance-fee-incentives. Commonly, a manager will not be entitled to carried interest until each investor in the fund recoups its applicable capital contributions (whether for a specific deal or for the whole fund) and achieves a preferred return thereon. Thereafter, a manager will begin to receive carried interest distributions equal to a percentage (or percentages) of remaining fund profits. *See* Nathaniel M. Marrs, Louis D. Hellebusch and Krishnakshi Das, *Variations In Structuring "Whole Fund" And "Deal By Deal" Carried Interest Or Promote In Real Estate Funds And Joint Ventures*, The Real Estate Finance Journal, Spring 2009, at 5.

13. Under the deal-by-deal model, returns are generally calculated for each investment, and the manager receives its carried interest as profits are realized on the particular investment. In contrast, under a whole-fund model, the manager does not receive carried interest distributions until the investors receive distributions equal to their total capital contributions to the entire fund and a preferred return on all such contributions. *See* Nathaniel M. Marrs, Louis D. Hellebusch and Krishnakshi Das, *Variations In Structuring "Whole Fund" And "Deal By Deal" Carried Interest Or Promote In Real Estate Funds And Joint Ventures*, The Real Estate Finance Journal, Spring 2009, at 6.

The polestar of our inquiry, therefore, is the relevant language of the parties' Agreement, which states:

> By the end of this Severance Period, you will have vested one year of service towards 1.0% of carried interest in Cross Atlantic Technology Fund, L.P. and 0.5% carried interest in The Co–Investment 2000 Fund, L.P. Therefore, you will receive 0.2% and 0.1% carried interest as your earned and vested carry in Cross Atlantic Technology Fund, L.P. and The Co–Investment 2000 Fund, L.P., respectively. In addition, *as special consideration* for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds. **Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.**

Andrews–Cross Atlantic Separation Agreement ("Agreement"), 7/5/00, at ¶ 5 (emphasis added).

Defendants assert that the above-bolded language in the Agreement clearly shows that they intended Andrews to receive the same kind of carried interest that he would have received had he remained at Cross Atlantic, i.e., "carried interest." Defendants also posit that Andrews' interpretation gives the same phrase "carried interest" different meanings among the individual sentences of paragraph 5 of the Agreement.

We recognize that the Agreement does not define the term "carried interest." Therefore, by inserting the term "as special consideration" in the third sentence of paragraph 5, it is reasonable to find the subsequent term "carried interest" ambiguous when viewed in the context of the remainder of the paragraph and in particular use of that term in sentences one and two. Accordingly, we can look to the parties' intent in drafting paragraph 5 of the Agreement. The trial court's conclusion that the parties intended to treat the carried interest and distribution manner in sentence three differently from those in sentences one and two of paragraph 5 is not only reasonable, but probable. We find, therefore, that the trial court properly declined to enter judgment in Defendants' favor on this issue.

### Andrews' Cross Appeal

On cross-appeal, Andrews claims that the court improperly denied his request for liquidated damages under section 260.10 of the WPCL. Specifically, he asserts that he is entitled to statutory liquidated damages when the jury determined that Defendants did not establish a good faith dispute to his requested wage payment.[14] Moreover, Andrews posits that an award of pre-judgment interest and an award of liquidated damages are not mutually exclusive remedies for a successful breach of contract plaintiff and that they "are not intended to compensate for the same loss." Cross–Appellant's Brief, at 74.[15] We agree.[16]

14. *See* Jury Verdict Slip, 8/30/13, at 6, 8.

15. We note that Andrews' cross-appeal is timely, and, thus, we have jurisdiction to consider his liquidated damages claim. On June 18, 2014, Defendants filed a timely notice of appeal from the trial court's May 22, 2014 final judgment entered on the jury's August 30, 2013 verdict. Andrews filed his notice of cross-appeal on June 25, 2014. Because Andrews' cross-appeal was filed within 14 days of the Defendants' timely notice of appeal, his cross-appeal is timely. *See* Pa.R.A.P. 903(b) ("If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal was served, or with-

Instantly, the trial court awarded Andrews more than $200,000 in prejudgment interest on his breach of contract claim against Cross Atlantic. However, the trial court denied Andrews' request for liquidated damages under the WPCL finding that if it awarded those damages, in addition to prejudgment interest, Andrews would face a "windfall."

Under the WPCL, a party is entitled to liquidated damages:

> **Where wages remain unpaid for thirty days beyond the regularly scheduled payday**, or, in the case where no regularly scheduled payday is applicable, for sixty days beyond the filing by the employe of a proper claim or for sixty days beyond the date of the agreement, award or other act making wages payable, or where shortages in the wage payments made exceed five percent (5%) of the gross wages payable on any two regularly scheduled paydays in the same calendar quarter, **and no good faith contest or dispute of any wage claim including the good faith assertion of a right of set-off or counter-claim exists accounting for such non-payment, the employe shall be entitled to claim, _in addition,_ as liquidated damages an amount equal to twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($ 500), whichever is greater.**

43 P.S. § 260.10 (emphasis added). The proper interpretation of section 260.10 is a question of law for which our standard of review is _de novo_ and our scope of review is plenary. **Krebs v. United Refining Co. of Pennsylvania**, 893 A.2d 776, 787 (Pa. Super. 2006).

■ The underlying purpose and intent of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy of an employer's _breach of its contractual obligation_ to pay wages. **See Laborers Combined Funds v. Mattei**, 359 Pa.Super. 399, 518 A.2d 1296 (1986) (emphasis in original); **compare** 43 P.S. § 260.1 (WPCL authorizes legal action to collect _contractually agreed upon_ wages) **with** 43 P.S. §§ 333.101 (Pennsylvania's Minimum Wage Act authorizes legal action to collect employees' _statutorily_ guaranteed wages). "The WPCL does not create an employee's substantive right to compensation; rather, it only establishes a statutory vehicle to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement." **Scungio Borst & Assocs. v. 410 Shurs Lane Dev., LLC**, 106 A.3d 103, 109 (Pa. Super. 2014) (en banc). Therefore, the right to recover wages "earned" by employees upon separation from employment under the WPCL is a statutory remedy

---

in the time otherwise prescribed by this rule, whichever period expires last.").

**16.** As the trial court acknowledges, on July 23, 2014, it ordered Andrews to file a Pa. R.A.P. 1925(b) concise statement of errors complained of on appeal in relation to his June 25, 2014 cross-appeal. On August 11, 2014, Andrews complied with this order, raising the propriety of the trial court's denial of his request for liquidated damages, expert fees and other costs in connection with his claims under the WPCL. _See_ Appellant's Pa. R.A.P. 1925(b) Statement, 8/11/14, at 1–2. We take note of this filing because the trial court states in its Rule 1925(a) opinion that Andrews has waived this issue due to his failure to include it in his earlier Rule 1925(b) statement filed in connection with his separate, June 3, 2014 appeal contesting the denial of expert fees and costs. As Andrews properly acknowledges, the judgment entered on May 22, 2014 acted to finalize all claims and all parties, thus, his cross-appeal raising the liquidated damages issue is now properly before us and preserved for our review. _See_ Pa. R.A.P. 341. For that reason, we decline to find his claim waived.

which *supplements* rather than *supplants* a common law action for breach of contract. 43 P.S. § 260.9a(a); *Laborers Combined Fund, supra* at 1299.

In *Thomas Jefferson Univ. v. Wapner*, 903 A.2d 565 (Pa. Super. 2006), our Court noted that:

> The WPCL is not only a vehicle for recovery of unpaid wages; *it also provides for damages in the event an employer withholds compensation in the absence of good faith.* Thus, if for instance an employer withholds wages based on a dispute with the employee that would result in a set-off, the employer's reliance on the set-off must be held in good-faith. *Otherwise, the employee is entitled to additional, liquidated damages pursuant to the statute*[.]

*Id.* at 574 (emphasis added). Good faith, under section 260.10, must be proven by the employer by clear and convincing evidence. *Id. Cf. Oberneder v. Link Computer Copr.*, 449 Pa.Super. 528, 674 A.2d 720 (1996), *aff'd*, 548 Pa. 201, 696 A.2d 148 (1997) (by contrast, WPCL attorneys' fees provision, section 260.9a(f) not conditioned upon finding of bad faith by employer and fees are mandatory for successful plaintiff).

Instantly, the trial court relied upon *Signora v. Liberty Travel*, 886 A.2d 284, 298 (Pa. Super. 2005), to support its decision to deny Andrews' request for liquidated damages. In *Signora*, a jury awarded the plaintiff overtime pay and interest, in addition to punitive damages and compensatory damages on her wrongful termination claim. The trial court refused to instruct the jury on the issue of liquidated damages under the WPCL.[17] On cross-appeal, the plaintiff argued that she was entitled to both pre-judgment interest pursuant to the WPCL and Pennsylvania's Minimum Wage Act (PMWA) and liquidated damages under the WPCL. Ultimately the *Signora* court concluded that the trial court properly restricted the plaintiff's right to recover only interest *under the PMWA*. In so holding, the Court noted that "the [WPCL's] provision for liquidated damages applies to instances where interest is not separately awardable" and that because the plaintiff was entitled to interest, "the additional award of liquidated damages would constitute dual payment, or a windfall." *Id.*

In *Frederich v. U.S. Computer Sys., Inc.*, 1995 U.S. Dist. LEXIS 9791 (E.D. Pa. July 10, 1995), the case relied upon by the *Signora* Court, plaintiffs sought both interest on the back pay awarded under the PMWA and liquidated damages under the WPCL.[18] Because the PMWA is silent on the issue of interest, the court looked to provisions of the Fair Labor Standards Act (FLSA)[19] to analyze whether interest on unpaid overtime wages was recoverable under the PMWA. The court recognized that the case involved "the interplay between recoveries available under the WPCL and PMWA[,]" *id.* at *3, and noted that the issue had not yet been decided by the Pennsylvania Supreme Court. Quoting a United States Supreme Court decision, *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945), the *Frederich* Court stated, "the liquidated damages provision [of the FLSA] is not penal in nature but constitutes compensation for the retention of a workman's pay which might result in dam-

---

**17.** Notably, the PMWA does not provide for liquidated damages as a civil remedy.

**18.** Because the action was before the court based on diversity jurisdiction, it was decided under Pennsylvania state law. *Erie R. Co. v.*

*Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

**19.** 29 U.S.C.S. § 201, et seq.

ages too obscure and difficult of proof for estimate other than by liquidated damages." *Brooklyn*, 324 U.S. at 707, 65 S.Ct. 895. The Court found that it would be inconsistent to allow an employee to recover basic statutory wage and liquidated damages under section 16(b) of the FLSA, with interest, "in view of the fact that interest is customarily allowed as compensation for delay in payment." *Id.* at 716, 65 S.Ct. 895.[20]

In *Braun v. Wal–Mart Stores, Inc.*, 24 A.3d 875 (Pa. Super. 2011), *aff'd*, 630 Pa. 292, 106 A.3d 656 (2014),[21] our Court also addressed the liquidated damages provision of the WPCL, stating:

> Pennsylvania courts have ... acknowledged the compensatory purpose of the WPCL's liquidated damages provision. The *Signora* Court, for example, adopted the rationale of *Friedrich [v. U.S. Computer Sys., Inc.*, [ ] 1995 U.S. Dist. LEXIS 9791 (E.D. Pa. July 10, 1995], which relied on *Brooklyn Sav. Bank [v. O'Neil*, 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 [ ] (1945) ], and concluded that "both the liquidated damages and pre-judgment interest are intended to compensate for the loss of use of the proper amount of wages payable" and such damages are not "punitive in nature." *Signora*, [at] 296; *see also Oberneder v. Link Computer Corp.*, [ ] 449

Pa.Super. 528, 674 A.2d 720, 722 (1996) (*"Oberneder I"*) (noting "the primary goal of the WPCL is to make whole again[ ] employees whose wages were wrongfully withheld by their employers"); *accord Ambrose v. Citizens Nat'l Bank of Evans City*, [ ] 5 A.3d 413, 420 (Pa. Super. 2010) [ ].

*Id.* at 961.

Although not binding on this Court, we find instructive a United States Court of Appeals for the Third Circuit decision that determined whether a good faith dispute under the WPCL precludes a successful plaintiff from collecting attorneys' fees under the statute. In concluding that a prevailing party may still recover attorneys' fees in such a situation, the court noted:

A careful analysis of the WPCL indicates that a finding of a good faith dispute between and employer and an employee should not preclude a plaintiff from filing a claim for attorney[s'] fees and costs. 43 P[.S.] §. 260.9a(f) expressly authorizes the payment of reasonable attorney[s'] fees and costs for any action brought pursuant to the statute. Conversely, the liquidated damages statute, § 260.10, does not mention attorney[s'] fees at all. **The liquidated damages statute [of the WPCL] is essentially a penalty provision aimed at deterring employers who, in bad faith,**

---

20. Unlike the liquidated damages provision of the WPCL, the liquidated damages provision of the FLSA does not require an employer to prove that he or she acted in good faith in order to prevent an employee from recovering liquidated damages. Rather, the relevant FLSA subsection provides that when an employer violates section 6 or 7 of the Act, "he or she shall be liable to the employee ... affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C.S. § f216(b). Therefore, we find that these two provisions are not analogous as one is an automatic recovery once a

plaintiff establishes a right to pay under the FLSA and the other statute requires a separate finding that an employer did not act in good faith.

21. Our Supreme Court granted allowance of appeal on the following issues: (1) whether Wal–Mart was subjected to a "trial by formula"; and (2) whether Appellees were thereby improperly relieved of their burden to produce class-wide common evidence on key elements of their claims. *Braun*, 106 A.3d at 659. Therefore, the issues of liquidated damages and prejudgment interest were neither before the Court nor decided by the Court.

withhold legitimate payment to its employees—it is not applicable to the issue of attorney[s'] fees. The good faith/bad faith issue relates to the liquidated damages provisions under § 260.10 which stands separately from the issue of attorney[s'] fees and costs.

*Barnhart v. Compugraphic Corp.*, 936 F.2d 131, 133 (3d Cir. 1991) (emphasis added).[22] We find the *Barnhart* Court's analysis of the WPCL, in particular regarding the liquidated damages provision, to be consistent with the purpose behind the Act. Specifically, the WPCL is intended to provide a vehicle for successful plaintiffs to be compensated for unpaid back wages based upon an existing contractual obligation; however, the statute's liquidated damages provision is available to only a subset of those prevailing plaintiffs who can also prove that they are entitled to damages as a result of an employer having no good faith defense to wages remaining unpaid for a set amount of time under the statute.[23] Section 260.10 is intended to be a disincentive or penalty for employers to withhold wages in bad faith.

Instantly, the court awarded Andrews interest on his breach of contract action, not his WPCL claim. It is well-established that in a contract action, an award of prejudgment interest does not depend upon discretion, but is a legal right and must be awarded despite the good faith of the party contesting the claim. *Gold & Co., Inc. v. Northeast Theater Corporation*, 281 Pa.Super. 69, 421 A.2d 1151, 1154 (1980). The purpose of awarding interest as damages is:

> to compensate an aggrieved party for detention of money rightfully due him or her, and to afford him or her full indemnification or compensation for the wrongful interference with his or her property rights. The allowance of interest as an element of damages is not punitive, but is based on the general assumption that retention of the money benefits the debtor and injures the creditor.

*Cresci Constr. Servs. v. Martin*, 64 A.3d 254, 261 (Pa. Super. 2013), citing 25 C.J.S. Damages, § 80. *See Fernandez v. Levin*, 519 Pa. 375, 548 A.2d 1191, 1193 (1988)

---

22. Recently, Senator Christine M. Tartaglione co-sponsored a bill to amend the WPCL; the bill was referred to the Committee Labor and Industry on January 28, 2015. *See* 2015 Pennsylvania Senate Bill No. 198, Pennsylvania One Hundred Ninety–Ninth General Assembly—2015–2016 (Jan. 28, 2015). The amendments were proposed in order to "improve employer adherence to the law with regard to payment of employee wages ... [and] to establish a self-funding means of increasing enforcement of and reporting on this law by the Department of Labor and Industry." Senate Co–Sponsorship Memoranda, Sen. Christine M. Tartaglione, (posted Dec. 1, 2014). To accomplish the purpose of "bring[ing] the [Act] into alignment with wage payment laws in other states," the legislation would "rais[e] penalties for violators and repeat offenders under the law." *Id.*

The following bolded text represents the proposed amendments to section 260.10:

[T]he employe shall be entitled to claim, in addition, as liquidated damages an amount equal to [twenty-five percent (25%) of the total amount of wages due, or five hundred dollars ($500), whichever is greater.] **twice the underpaid wages due or one thousand dollars ($1,000), whichever is greater. Each week in which an employe is paid less than the applicable wage under this act shall constitute a separate violation which shall be subject to a separate penalty.**
Notably, the text indicates that the award of liquidated damages is penal in nature.

23. In adopting this reasoning, we implicitly overrule our Court's analysis of section 260.10 in *Signora* where the panel looked to unrelated federal statutes and whether interest on unpaid overtime wages was recoverable under them. *See M.A.T. v. G.S.T.*, 989 A.2d 11 (Pa. Super. 2010) (Superior Court, sitting en banc, may overrule the decision of a three-judge panel of the Court).

(right to interest upon money owing upon contract, or prejudgment interest, begins at time payment is withheld after it has been duty of debtor to make such payment). *See also Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572 (Pa. Super. 2003) (in contract cases, statutory prejudgment interest awardable as of right).

■ Although Andrews received prejudgment interest under his breach of contract claim for unpaid wages, he is not precluded from recovering liquidated damages under the WPCL. As noted, the WPCL is **a supplementation to and not a substitute for one's common law cause of action for breach of contract.** *Laborers Combined Funds, supra.* Moreover, the two recoveries, prejudgment interest and liquidated damages, are distinct awards made for different purposes. Prejudgment interest compensates an employee for the injury sustained due to delayed payment of wages and a liquidated damages award represents damages due to an employer's lack of good faith in withholding past wages. To read section 260.10 any other way would render the liquidated damages provision meaningless where statutory interest is a legal right under a breach of contract action and would result in a constrictive interpretation of the WPCL. *See Braun, supra* at 960 (in line with purpose of making employees whole, we must "construe the WPCL liberally.").

Instantly, the trial court charged the jury with regard to the burden of proof for liquidated damages under the WPCL. N.T. Jury Trial, 8/30/13, at 96–97. Because the jury returned a verdict finding that Defendants did not act in good faith when they failed to pay Andrews under the Agreement, *id.* at 121, 123; *supra*, Defendants did not meet their burden of proof to show, by clear and convincing evidence, that they acted in good faith. *Thomas Jefferson, supra*; 43 Pa.C.S. § 240.10. Accordingly,

Andrews is entitled to liquidated damages under the WPCL. Therefore, we reverse that portion of the judgment denying his request for liquidated damages and remand for the proper calculation of such damages in accordance with section 260.10 of the WCPL.

Order affirmed in part and reversed in part in accordance with the dictates of this decision. Jurisdiction relinquished.

President Judge Emeritus Ford Elliott, President Judge Emeritus Bender, Judge Panella and Judge Ott join in this Opinion.

Judge Bowes files a Dissenting Opinion joined by Judge Shogan, Judge Olson and Judge Dubow.

DISSENTING OPINION BY BOWES, J.:

I respectfully dissent from the majority's disposition in this matter. I agree with Cross Atlantic Capital Partners, Inc. ("Cross Atlantic") and Donald Caldwell (collectively "Appellants") that the statute of limitations had expired when this action was instituted. I would therefore reverse the judgment entered against Appellants and order entry of judgment in favor of Appellants as to all claims raised by Nicholas D. Andrews ("Andrews").

The relevant facts are as follows. Cross Atlantic is a private equity firm raising money from institutional investors and placing it in investment funds. Each fund purchases equity interests in companies that are viewed as having potential profitability and that are known as portfolio companies. The funds are organized as limited partnerships with Cross Atlantic acting as general partner. As general partner, Cross Atlantic operates as the investment manager, making investment decisions, selecting companies in which to invest, and offering advice to the portfolio companies.

The limited partners are the investors who place their money in the fund.

The limited partners receive an ownership interest in each fund in return for their investments and are entitled to most of the profit since they bear the majority of the risk if the fund loses money. Cross Atlantic provides some infusion of capital into each fund, so it is entitled to a smaller percentage of profit than the limited partners and has a lower priority for receipt of any profits generated by a fund.

In 1999, Cross Atlantic formed an investment vehicle called the Technology Fund, L.P., which was designed to provide capital for technological companies. Although XATF Management, L.P. ("XATF") was the Technology Fund's general partner, Cross Atlantic served as the general partner for XATF Management, L.P., as well as the investment manager of the Technology Fund. There were approximately one hundred limited partners in the Technology Fund, who provided approximately $114 million in funds while XATF invested an additional $6 million.

The plaintiff in this action, Andrews, began to work for Cross Atlantic as a principal on September 1, 1999. Principals research prospective portfolio companies, conduct market research, and meet with the entrepreneurs running a company in which Cross Atlantic is contemplating investing funds under its control. Principals do not have an ownership interest either in Cross Atlantic or in any investment fund managed by Cross Atlantic. Andrews' salary was $125,000, with the potential for a bonus of $75,000 at the end of his first year. While employed there, Andrews researched and recommended GAIN Capital as a portfolio company in which the Technology Fund would invest, and thereafter, he negotiated a $2.5 million investment by Cross Atlantic in GAIN in return for a 22.75% stock ownership interest by Cross Atlantic.

Approximately nine months after he was hired, Andrews was informed that he was not going to be promoted to partner, and he resigned shortly thereafter, on June 1, 2000. Andrews received three months' salary and a $75,000 payment representing the bonus that he would have earned had he stayed at Cross Atlantic until September 1, 2000. Pertinent to this matter is paragraph five of the Separation Agreement ("Agreement") entered into between Cross Atlantic and Andrews on July 5, 2000. Cross Atlantic agreed therein that Andrews was entitled to a portion of the Technology Fund's carried interest, as follows:

> By the end of this Severance Period, you will have vested one year of service towards 1.0% of carried interest in CACP Technology Fund, L.P. and 0.5% carried interest in The Co–Investment 2000 Fund, L.P. Therefore, you will receive .0.2% and 0.1 % carried interest as your earned and vested carry in CACP Technology Fund, L.P. and The Co–Investment 2000 Fund, L.P., respectively. In addition, as special consideration for your effort put forth on GAIN Capital, we will offer you a full 1.0% and 0.5% carried interest on that particular transaction to be earned, paid and distributed at such time that the distribution is made to all other Limited Partners of the funds. Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds.

The contract did not define carried interest.

On September 3, 2003, Andrews read a press release indicating that some GAIN shareholders had sold a portion of their shares. On September 4, 2003, Andrews

sent Cross Atlantic's Chief Financial Officer, Brian Adamsky, an email about whether the Technology Fund was one of the shareholders that sold GAIN stock:

I saw the press release for Gain's [deal] with Tudor on VentureWire, and noticed in Mark's quote a reference to 'liquidity to existing shareholders'. Did XATF sell some or all of its position into the round? If so, **the sale would trigger an obligation under my separation agreement,** so please advise as to the amount and timing of payment to me.

Plaintiff's Exhibit 6 (emphasis added). Thus, Andrews conveyed his belief that he was entitled to a percentage of the proceeds from any sale of GAIN shares by XATF.

Later that same day, Cross Atlantic's president, Glenn Rieger, expressed Cross Atlantic's position that it disagreed with Andrews' interpretation of the language in the separation agreement:

Nick—It has been a while, I hope all is well! GAIN has made a lot of progress since your resignation from CACP, and continues to be one of our better performing companies. As we were putting this transaction together with Tudor I had in the back of my mind our contractual obligations to you. Believe me if I felt there was an obligation to payout to you, I would be the first to contact you because that would mean a payout to me as well. The $10MM deal with Tudor was a series C round with all but $1MM being used to redeem common A & B stock. Mark is the largest recipient in the group clearing over $6 MM personally. XATF is receiving $1.1 MM to be distributed to its [limited partners] while retaining between 18.8–19.4% ownership based on an EBITDA[24] ratchet that

will not be finalized until 12/31/04. The operative sentence of your agreement is the last sentence of paragraph # 5— "Distributions of your participation in these carried interests will be in all cases identical to what you would have received if still employed by the funds." **Since XATF is not into its carry at this time, there is no distribution to the GP under the carry provision of the Partnership Agreement and hence, no distribution to any employees/partners/others from the GP as a result of this transaction.** I will keep you posted on the outcome of the fund as it may relate to any carry as those events occur.

Plaintiff's Exhibit 6 (emphasis added). A few days later, on September 9th, Andrews sent Rieger the following email:

I went over to my storage place and dug out the separation agreement and my attendant materials, and in reading the file confirmed that **we have a genuine disagreement about the nature of the agreement.** While this is not a big deal when the immediate amount involved is $11,000 I think we can agree that **we are better off reconciling our views before the number goes up.** Paragraph 5 of the agreement is language you proposed. While I think I can understand how you read the 'if still employed' clause to create some ambiguity as regards the fund-level carry, as regards the gain-specific 'carry' there can be no doubt about the intent and meaning of 'special recognition to be earned, paid, and distributed at such time as the distribution is made to—Limited Partners.' Obviously this language is all contextualized by the fact that I was not an LP myself, by the lack of a predecessor

24. EBITDA is an acronym for "earnings before interest, taxes, depreciation and amortization." Andrews does not claim that the reference to EBITDA helps his case, so I need not address it further.

agreement or other basis for an 'if still employed' comparison, and most of all by the performance gap between Gain and XATF. I think we all expected at the time of the agreement, and still hope today, that XATF would and will make payouts. (I'm actually quite encouraged by your email in this regard—if you were thinking about me on this deal but expecting to pay all early simultaneously, XATF must be pretty close to paying out.) Nonetheless, **I think we should prepare for the possibility that Gain winds up positive and XATF negative by clarifying the language of paragraph 5 as soon as possible.**

Plaintiff's Exhibit 6 (emphases added).

This email exchange established that Andrews knew on September 4, 2003, that Cross Atlantic's interpretation of "carried interest" as to GAIN distributions in paragraph five was in conflict with his own. In his email, Andrews maintained that his right to a percentage of carried interest as to GAIN distributions was triggered any time Cross Atlantic received any money from GAIN. In its response, Cross Atlantic informed Andrews that carried interest was not present until the original invest-

ment and preferred interest were recouped.

Andrews decided not to sue in 2003 for the $11,000 to which he claimed entitlement because the amount was too small. N.T. Trial, 8/26/13, at 130 ("On a cost benefit basis, hiring a attorney to recover $11,000 didn't make sense"). In the ensuing years, Andrews followed GAIN's financial progress, reading press releases and searching the internet. N.T. Trial, 8/27/13, at 86–87. One press release indicated that Cross Atlantic was among shareholders receiving a distribution of funds from GAIN. *Id.* at 91.

In December 2010, seven years after the email exchange wherein the parties set forth their positions about the meaning of "carried interest" on GAIN distributions in paragraph five, Andrews inquired about the Technology Fund. Mr. Adamsky sent Andrews the available financial data about that Fund, including distributions it received from GAIN. He also stated that Cross Atlantic would let Andrews know if there were any changes in the fund that would trigger an allocation to Andrews. Sales of the Technology Fund's shares in GAIN resulted in six distributions of the following amounts on the following dates:

| | |
|---|---|
| September 10, 2003: | $ 1,090,381 |
| April 4, 2006: | $10,000,004 |
| January 14, 2008: | $42,433,651 |
| December 21, 2010: | $14,993,616 |
| March 15, 2012: | $ 3,666,451 |
| February 13, 2013: | $ 3,128,423 |
| Aggregate distributions: | $75,311,526 |

N.T. Trial, 8/28/13, at 36–38. The un-contradicted evidence was that all these distributions repaid capital contributions and preferred interest to the Fund's investors. *Id.* at 44.

Andrews filed this lawsuit in 2011, alleging breach of contract against Cross Atlantic and a violation of the Wage Payment Collection Law ("WPCL") against Cross Atlantic and Mr. Caldwell, Cross Atlantic's Chief Executive Officer. He claimed, as

outlined in his September 2003 email, that the term "carried interest" as to GAIN distributions meant any amount received by GAIN. He averred that he was entitled to one percent of all GAIN distributions, or approximately $750,000.

Appellants countered that the action was barred by the statute of limitations. The trial court agreed as to the September 2003 distribution, but, under a set of special interrogatories, allowed the jury to decide whether Andrews was entitled to one percent of 2006–2013 distributions made to GAIN shareholders. The jury returned a verdict of $742,221.45 against Appellants. The court added prejudgment interest and attorney's fees to the award, and, after Appellants' timely post-trial motion was denied, judgment was entered against them in the amount of $1,216,617.70. On appeal, Appellants maintain that the statute of limitations prevented recovery herein, and I agree.

I first address the majority's position that Appellants' statute of limitations defense is waived. Appellants preserved this defense at every stage of the proceeding. In their answer to Andrews' complaint, they claimed that this action was barred by the applicable statute of limitations in that Andrews knew that he had the right to sue more than four years prior to instituting this lawsuit. Answer With New Matter, 10/14/11, at ¶¶ 33–34. Appellants then moved for summary judgment. Their first legal position was that Andrews' claims were barred by the applicable statute of limitations. Motion for Summary Judg-

ment, 12/14/12, at 16. They argued that the claims raised herein arose "no later than 2003, when distributions had been made to limited partners related to [Cross Atlantic's] GAIN Capital Investment and no distributions were made to [Andrews] despite his demand for payment under paragraph 5 of the Separation Agreement." *Id.* at ¶ 66. In its summary-judgment argument as to the statute of limitations, Appellants relied upon the September 2003 email exchange, wherein the parties unambiguously set forth their conflicting interpretations of the language in paragraph five of the Agreement, and Appellants observed that Andrews did not bring an action to assert his right to payment thereunder until 2011.[25] Appellants noted that, at his deposition, Andrews admitted that he knew about the GAIN distributions as they were occurring. Deposition of Nicholas D. Andrews, 6/15/12, at 93–95. Thus, Andrews had to commence this lawsuit by September 2006, in order to recover under the WPCL and by September 2007 for his breach-of-contract count to be timely. Appellants were denied summary judgment.

At the close of Andrews' case, Appellants moved for nonsuit, and, among other reasons, submitted that Andrews did not meet his burden of proof on the statute of limitations. N.T. Trial, 8/28/13, at 72. They argued that Andrews knew about his claims against them in September 2003, when he admittedly was aware that GAIN distributions were being made and that Appellants did not agree that he was entitled to a share of those distributions under

**25.** Andrews' cause of action under the WPCL is subject to a three-year statute of limitations, 43 P.S. § 260.9a(g) (footnote omitted) ("No administrative proceedings or legal action shall be instituted under the provisions of this act for the collection of unpaid wages or liquidated damages more than three years after the day on which such wages were due and payable as provided in sections 3 and

5."). A four year statute of limitations applies to the breach of contract action. 42 Pa.C.S. § 5525(8) ("the following actions and proceedings must be commenced within four years ... [a]n action upon a contract, obligation or liability founded upon a writing not specified in paragraph (7), under seal or otherwise, except an action subject to another limitation specified in this subchapter.").

paragraph five. *Id.* at 73. Appellants maintained that "it was unequivocal in 2003 that Cross Atlantic would not honor [its] obligation at that time. [Andrews] knew he had a claim. There had been an actual breach at that point, according to [Andrews'] interpretation. He believed he was owed $11,000, one percent of the distribution that was made." *Id.* at 73–74. Under Andrews' construction, they continued, there was an actual breach of the contract by them in 2003 when they said they did not agree with his reading of paragraph five. The trial court rejected that position. Appellants leveled the identical argument when moving for a direct verdict. N.T. Trial, 8/30/13, at 3–5. The statute of limitations argument was raised in a post-trial motion and addressed by the trial court.

The majority's position is that the statute of limitations issue is waived because Appellants failed to use the words "absolute and unequivocal repudiation" of the Agreement in their 1925(b) statement. Majority's Opinion at 129. I must respectfully disagree with the majority's waiver position. Appellants consistently argued that the statutes of limitations expired because they repudiated Andrew's interpretation of paragraph five in 2003, more than four years prior to when he brought this lawsuit. Appellants' concise statement of errors complained of on appeal is replete with their position that the statutes of limitations had run on this lawsuit. In pertinent part they claimed:

1. The Court erred and/or abused its discretion in denying Defendants' Motion for Summary Judgment, Motion for Compulsory Non–Suit and/or Motion for Directed Verdict, and otherwise in failing to rule as a matter of law and/or direct or instruct the jury that all of Plaintiffs claims are barred by the applicable statutes of limitations.

a. The undisputed evidence established that the breach of contract occurred in this case in September 2003.

b. In September 2003, Plaintiff knew, or through the exercise of reasonable diligence should have known, that he had a claim against Defendants for breach of contract and violation of the Pennsylvania Wage Payment and Collection Law under his interpretation of paragraph 5 of the Separation Agreement, such that Plaintiff was required to commence this action no later than September 2006 (on the Wage Payment and Collection Law claim) and September 2007 (on the breach of contract claim).

. . . .

d. **By September 9, 2003, Plaintiff knew that because of Defendants' interpretation of paragraph 5 of the Separation Agreement, Defendants would not be paying him the amounts that Plaintiff believed were due to him at that time—or any additional amounts that might become due to him at any time thereafter—under his interpretation of paragraph 5 of the Separation Agreement.**

e. **The statute of limitations began to run *at the latest* on September 9, 2003, which is when Plaintiff wrote his email to Defendants showing that Plaintiff knew to a certainty that the payments that he sought under paragraph 5 of the Separation Agreement would not be made.**

f. Plaintiff's breach of contract claim was predicated entirely on the theory that Defendants had misinterpreted paragraph 5 of the Separation Agreement in September 2003. **Defendants' misinterpretation, if any, occurred by September 9, 2003, and simply was applied consistently thereafter,** hence if Defendants' interpretation of the Separation Agreement was wrong, there was

only one error, and only one breach of the Separation Agreement, **which breach occurred on September 9, 2003** and continued through to the date of trial.

g. That Defendants made no subsequent payments to Plaintiff was the natural consequence of Cross Atlantic's September 4, 2003 statement of its position that Plaintiff believed to be a breach of the Separation Agreement. Each additional instance of nonpayment was not a separate breach; rather each instance was a mere continuation of the initial breach.

Concise Statement of Errors Complained of on Appeal at 1–4 (emphases added). This language is **precisely** Appellants' position in this appeal, and, **exactly mirrors** Appellants' statute of limitations defense throughout this lawsuit. I simply cannot reconcile the majority's waiver position with the procedural history of this case.

I now address Appellants' position that this lawsuit is barred due to the expiration of the applicable statutes of limitations. The issue of whether the "the statute of limitations has run on a claim is a question of law[.]" *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 859 (2005). "Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision." *Stamerro v. Stamerro*, 889 A.2d 1251, 1257 (Pa.Super. 2005) (citation omitted). It is established that, "The Judicial Code provides in pertinent part that limitations periods are computed from the time the cause of action accrued. 42 Pa.C.S. § 5502(a). In Pennsylvania, "a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Fine, supra* at 857. Thus, "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises, [and o]nce a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Id.*

In *2401 Pennsylvania Ave. Corp. v. Fed'n of Jewish Agencies of Greater Philadelphia*, 507 Pa. 166, 489 A.2d 733, 742 (1985) (footnote omitted), our Supreme Court articulated, "Pennsylvania has long recognized that an anticipatory repudiation by an obligor to a contract gives the obligee the immediate right to sue for breach of contract[.]" Thus, a breach of contract case accrues when one party to an agreement has repudiated or renounced a contract. *Weinglass v. Gibson*, 304 Pa. 203, 155 A. 439 (1931). Simply put, the anticipatory repudiation of a contract accords the plaintiff an immediate right to sue for breach of contract. *Id.* "To be effective, a renunciation must be absolute and unequivocal." *Shafer v. A. I. T. S., Inc.*, 285 Pa.Super. 490, 428 A.2d 152, 155 (1981). In other words, a contractual breach occurs when there is "an absolute and unequivocal refusal to perform or a distinct and positive statement of an inability to do so." *2401 Pennsylvania Ave. Corp., supra* at 736 (citation omitted).

More recently, in *Harrison v. Cabot Oil & Gas Corp.*, 631 Pa. 268, 110 A.3d 178 (2015), our High Court re-affirmed that Pennsylvania continues to apply the doctrine of repudiation. Therein, it held that the institution of a declaratory judgment action seeking interpretation of a contract would not constitute a repudiation. This ruling is, of course, logically consistent with the doctrine. Asking for a judicial construction of the contract would not be a rejection of the contract. By seeking a declaratory judgment, the party is acknowledging that it will abide by the court's construction of the contract in question, which was not a repudiation.

Thus, the filing of a declaratory judgment action contesting the validity or scope of an agreement is not an anticipatory breach, because it "does not entail ... an unequivocal refusal to perform." *Id.* at 184.

The *Harrison* Court applied Restatement (Second) of Contracts § 250, which states:

A repudiation is

(a) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach under § 243, or

(b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.

Restatement (Second) of Contracts § 250. In pertinent part, Restatement 243 provides:

(3) Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installments not related to one another, his breach by non-performance **as to less than the whole,** whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.

Restatement (Second) of Contracts § 243 (emphasis added).

In September 2003, Cross Atlantic absolutely and equivocally refused performance of the contract as a whole in accordance with Andrews' interpretation of "carried interest." In his September 2, 2003 email, Andrews maintained that "carried interest," as applied to distributions from GAIN, had a different meaning from the industry meaning and how it was used in other portions of the contract. Andrews suggested that the term "carried interest"

meant **any monetary payment** made by GAIN.

Cross Atlantic responded that day to Andrews stating that "carried interest" meant a distribution of the Technology Fund's excess profits, which were not generated until every partner obtained a return of its original investment and after the limited partners were paid the preferred interest on their investments. I observe that this interpretation of the term "carried interest" is consistent with how that language is used in other portions of the July 5, 2000 contract and with the industry meaning of the word. In its email, Cross Atlantic denied Andrews' demand for a percentage of the GAIN distribution made that year and stated that it would not pay a percentage on anything other than money paid from GAIN after the recoupment of capital and preferred interest. Thus, the causes of action herein accrued when Cross Atlantic clearly and unambiguously voiced its total disagreement with Andrews' interpretation of the term "carried interest" and his right to any payments, as a whole, on principal and preferred interest.

Cross Atlantic's September 4, 2003 email to Andrews thus constituted an anticipatory repudiation of Andrews' view of the meaning of "carried interest" under paragraph 5 of the Separation Agreement. Consequently, the statutes of limitations herein began to run on September 4, 2003 for Andrews' breach of contract and WPCL claims. Contrary to Andrews' argument, each distribution did not give rise to a separate action with a separate limitations period. Appellants did not merely miss one payment in a contract requiring more than payment, which would not constitute a repudiation of the contract terms. *See Restatement (Second) of Contracts* § 243. Appellants' obligation to pay, even under Andrews' position, was triggered

only when GAIN made a distribution, which may not even have occurred after 2003. In 2003, Cross Atlantic stated that "carried interest" did not have the meaning ascribed to it by Andrews, which was a total repudiation of the entire paragraph, as interpreted by Andrews.

Rieger communicated three points in his September 4, 2003 email: (1) the Technology Fund was receiving $1.1 million from the sale of GAIN stock and was distributing over 80% of this sum to its limited partners while retaining 18–19%; (2) these distributions did not generate carried interest ("XATF is not into its carry at this time"), so Andrews was not eligible for payment of carried interest under paragraph 5 of the separation agreement; and (3) Rieger himself was ineligible for payment because the sale of GAIN stock was not carried interest ("believe me if 1 felt there was an obligation to payout to you, I would be the first to contact you because that would mean a payout to me as well"). Through these points, Rieger repudiated Andrews' interpretation of "carried interest" in the separation agreement as any money received from GAIN. Rieger clearly communicated that sales of GAIN stock and distributions to the limited partners and the general partner from these sales did not, by themselves, trigger Andrews' right to payment of carried interest.

In his September 9, 2003 response to Rieger, Andrews admittedly recognized that Rieger had repudiated his interpretation of "carried interest," stating that "we have a genuine disagreement about the nature of the [separation] agreement," and that "there can be no doubt" that his interpretation of "carried interest" was correct. Andrews urged that "we are better off reconciling our views before the number goes up" beyond $11,000.00, the amount that Andrews claimed Cross Atlantic owed him from the 2003 sale of GAIN stock.

The email exchange compels only one conclusion: in September 2003, Cross Atlantic, through Rieger, directly repudiated Andrews' position that it owed him carried interest each time Cross Atlantic sold GAIN stock. Moreover, Andrews understood that Cross Atlantic rejected his interpretation of carried interest. Indeed, at his deposition, Andrews actually admitted that he knew that he had the right to sue Cross Atlantic in 2003, but decided against it because the amount in question, $11,000, was too small to justify instituting a lawsuit. This admission establishes that the statutes of limitations commenced in September 2003.

Andrews counters that the final sentence of Rieger's September 4, 2003 email, which was "I will keep you posted on the outcome of the fund as it may relate to any carry as those events occur," shows that the email was not a repudiation. Andrews insists that the quoted language suggests that Cross Atlantic would someday pay Andrews carried interest on sales of GAIN stock. However, that sentence must be read in light of the remainder of Rieger's email. Read in context, the final sentence can have only one meaning, which was that, while sales of GAIN stock alone do not trigger Cross Atlantic's obligation to pay carried interest, separate events other than sales of GAIN stock may trigger this obligation, and Cross Atlantic would contact Andrews upon the occurrence of those events. In other words, if and when more than a return of initial investment and preferred interest was made through GAIN, Andrews would receive one-percent of the distribution. Rieger's email did not merely reject Andrews' right to payment for the 2003 sale of GAIN stock, as the trial court suggested; it rejected Andrews' right to payment for all future sales of GAIN stock, unless and until Cross Atlantic received more than a return of the

originally-invested funds and preferred interest on those funds.

In accordance with the requirements of *Harrison* and *2401 Pennsylvania Avenue Corp., supra,* Rieger's email provided a unambiguous and unequivocal communication that Cross Atlantic would in fact not perform under the separation agreement in the manner demanded by Andrews. The Supreme Court in *2401 Pennsylvania Avenue Corp.* found that there was no repudiation present because the allegedly breaching party recognized that he possibly had an obligation under the contract in question. As noted in *Harrison*, institution of a declaratory judgment action is not a repudiation since, by instituting it, the party indicates that he will abide by the court's resolution of the contrasting views of the contract language. However, in this case, Rieger unequivocally rejected Andrews' interpretation of the contract terms as a whole.

Andrews argues that each payment owed to him by Cross Atlantic gave rise to a separate cause of action with a separate limitation period. Andrews equates his case with installment contract cases where a separate statute begins running each time the defendant misses an installment, which as noted *supra*, is not subject to the repudiation doctrine. *See Ritter v. Theodore Pendergrass Teddy Bear Prod., Inc.,* 356 Pa.Super. 422, 514 A.2d 930, 938 (1986) ("where installment or periodic payments are owed, a separate and distinct cause of action accrues for each payment as it becomes due"). However, herein, Cross Atlantic did not miss an installment of a periodic payment that was due under the contract. Cross Atlantic denied that it owed any money at all under the contract in question under its understanding of the term "carried interest."

Our Supreme Court's decision in *Barr v. Luckenbill,* 351 Pa. 508, 41 A.2d 627

(1945), is pertinent. At the conclusion of plaintiff's case, the court concluded that the action was barred by the statute of limitations and our Supreme Court concurred. In 1931, the plaintiff gave the defendant $6,500 and, in 1933, $1,000. The defendant agreed to invest the money in securities that the defendant selected. Until the investment was made, the defendant was obligated to pay the plaintiff three percent interest on the entire $7,500. In 1933, the defendant informed the plaintiff that the defendant had loaned $4,500 of the funds to a third party at the rate of six percent interest and that the defendant therefore owed the plaintiff $3,000.

The defendant paid interest intermittently on the $3,000 but none on the $4,500, and the third party never repaid the defendant interest or principal on the loaned funds. In 1940, the defendant made some payments toward the $3,000 loan, informed plaintiff that he considered that loan satisfied, and never paid interest on the $3,000 thereafter. The plaintiff instituted the lawsuit in 1943, demanding principal and interest on the $4,500. Our Supreme Court held that, even if the $4,500 loan to the third part was unauthorized, when the defendant made that loan, he repudiated any obligation to pay interest or principal as to the $4,500. It concluded that the statute of limitations had run since the loan to the third party occurred ten years prior to the institution of the lawsuit.

The plaintiff averred that the repayment of the $3,000 restarted the statute as to the $7,500 debt, but the *Barr* court concluded that the repayment did not relate to the $4,500 debt and did not toll the statute as to the plaintiff's right to collection on the monies loaned to the third party. Thus, even though the plaintiff was entitled to three percent interest on the $4,500, payable as installments, the Court found that

the statute of limitations had run on the plaintiff's right to receive either principal or interest on that amount as of the date of repudiation, which was when the loan was made to the third party.

Based on these precedents, I conclude that the statutes of limitations began to run on Andrews' entire contract and WPCL claims on September 4, 2003, when Rieger repudiated Andrews' construction of the Separation Agreement. The three-year statute of limitations on Andrews' WPCL claim expired on Tuesday, September 5, 2006, as Monday was a holiday, and the four-year statute for Andrews' contract action expired on September 4, 2007. Andrews' 2011 lawsuit is time-barred in its entirety.

The decisions cited in Andrews' brief are inapposite. For example, in *Pennsylvania Turnpike Comm'n v. ARCO*, 31 Pa. Cmwlth. 212, 375 A.2d 890 (1977), an oil company entered into a long-term lease with the Turnpike Commission to operate a gas station along the Pennsylvania Turnpike. The lease prescribed that rent was payable on a monthly basis. The parties disputed the gas station's computation of rent from time to time over their twenty-year relationship, but neither party repudi-ated the lease. After twenty years, the Turnpike Commission brought an action to recover damages for alleged underpayment of rent by the oil company during the preceding six years of installment payments, the applicable limitations period for contract claims at that time. The Commonwealth Court declined to bar the action under the statute of limitations, explaining that "the Commission could have no cause of action until each allegedly improperly computed payment was made and, as to each such payment, a separate and distinct cause of action would accrue." *Id.* at 892. That conclusion was logical because the oil company, unlike Cross Atlantic, never repudiated the contract. *Also cf. Van Sciver v. Van Sciver*, 337 Pa. 390, 12 A.2d 108, 110 (1940) (separate statute ran for each deficient alimony payment, where deficiencies appeared to be unintentional, and there was no suggestion in Supreme Court's opinion that husband had repudiated his alimony obligations); *Ritter v. Theodore Pendergrass Teddy Bear Prods., Inc.*, 356 Pa.Super. 422, 514 A.2d 930, 935 (1986) (separate statute ran for each missed installment; no suggestion in this Court's opinion that defendant repudiated contract).[26]

---

26. Moreover, even if this action was timely, I would reject Andrews' position that "carried interest," as applied to distributions from GAIN, has a different meaning than how that term is employed in other portions of the separation agreement and than its ordinary meaning in the industry. As conceded by the majority in footnotes four and twelve, the words "carried interest" mean profits, *i.e.*, money paid after a return of capital investment and preferred interest.

When we interpret a contract, we must accord unambiguous language its ordinary meaning and give "effect to an **entire document**, if possible, and not only those portions supporting a specific conclusion." *Lenau v. Co-eXprise, Inc.*, 102 A.3d 423, 431 (Pa.Super. 2014) (emphasis in original). A "disagreement between the parties on the meaning of language or the proper construction of contract terms does not constitute ambiguity." *Id.* (citation omitted). It is illogical to give the same words in an agreement a different meaning, but Andrews insists that "carried interest," when applied to GAIN distributions, has a meaning different from how that term is used in the remainder of the contract. Additionally, Andrews' position is not consistent with the ordinary meaning of "carried interest," which is profit paid after investment and preferred interest are satisfied. Under anyone's understanding of the word, "interest" cannot mean principal. Yet, the majority's holding gives Andrews a percentage of interest and principal when he clearly and unambiguously is entitled only to the former under the Agreement.

As I believe that this action should be dismissed in its entirety, it is unnecessary in this dissent to address any of the positions raised in the cross-appeal.

For the foregoing reasons, I dissent from the majority's disposition herein. I would remand for entry of judgment in favor of Cross Atlantic Capital Partners, Inc. and Donald Caldwell and against Nicholas D. Andrews.

Judge Shogan, Judge Olson and Judge Dubow join this dissenting opinion.