J-S19043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| ADRAIN JUAREZ AND DANIELLE LINDO | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JEUNE INVESTMENTS, LLC, ODAGBODO INVESTMENTS, LLC, J&L GENERAL CONTRACTORS, LLC, HARMAN DEUTSCH CORPORATION, IFE ODAGBODO, PATRICK JEUNE, JP HOLDINGS GROUP, LLC, JP HOLDINGS GROUP, SAMUEL ODAGBODO | : | No. 2256 EDA 2024 |
| | : | |
| APPEAL OF: SAMUEL ODAGBODO | : | |

Appeal from the Judgment Entered July 24, 2024
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  190501278

BEFORE:  PANELLA, P.J.E., STABILE, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED SEPTEMBER 12, 2025**

Samuel Odagbodo ("Samuel") appeals pro se from the judgment entered by the Philadelphia Court of Common Pleas ("trial court") against him in his individual capacity, holding him jointly and severally liable for a judgment awarded to Adrian Juarez and Danielle Lindo (together, "Buyers"). The judgment was the result of a civil action brought by Buyers against the various corporate entities and individuals that developed and constructed a rowhouse with substantial defects that they then marketed and sold to Buyers. Following a bench trial, the trial court determined that Samuel and his co-

defendants "sold a defective house to [Buyers], failed to remedy the situation while continuously making promises that a remedy was forthcoming, and failed to provide the warranty that was promised to [] Buyers in the agreement of sale yet continued to direct [Buyers] to make use of it." Trial Court Opinion, 12/6/2024, at 11. Upon review, we affirm.

**Facts**

Buyers purchased a newly constructed rowhouse in Philadelphia ("the Home") in November 2017. The agreement of sale ("Sales Agreement") listed the sellers as Odagbodo Investments, LLC ("Odagbodo LLC") and Jeune Investments, LLC ("Jeune LLC") (together, the "LLC Sellers"). N.T, 9/26/2023, at 110. Samuel's brother, Ife Odagbodo ("Ife"), and Patrick Jeune ("Jeune") signed the Sales Agreement with their individual names without referencing their respective limited liability companies ("LLCs") or their roles within the LLCs. Exhibit P-2 (Sales Agreement).

Buyers specifically liked that the LLC Sellers were the builders of the Home, which was noted on the sellers' property disclosure form ("the Disclosure"). *See* N.T., 9/26/2023, at 102, 107, 109. The Disclosure bore the electronic signatures of Samuel and Jeune, again without reference to their respective LLCs or roles within them. *Id.* at 118; Exhibit P2-A (Disclosure).

In an addendum to the Sales Agreement, the LLC Sellers agreed to provide a one-year new construction builder's warranty. N.T., 9/26/2023, at

124. Based upon discussions with the sellers during negotiations, Buyers'
understanding of the warranty was that it would cover any conditions that
arose in the first year, which was important to Buyers because they chose to
purchase new construction to avoid systemic issues with a pre-existing home
and the warranty gave them peace of mind for their first home purchase. ***See***
***id.*** at 102, 104-05, 123-24. At closing, Buyers received a brochure describing
the provided Long & Foster home warranty (the "Warranty"), with a "more in-
depth brochure" arriving two weeks later. ***Id.*** at 116-17.

The Home's deed was signed by Jeune and Ife in the presence of a
notary. ***Id.*** at 119; Exhibit P-6 (property deed). Unlike other legal documents
related to the sale, the deed noted that Jeune was signing as a member of
Jeune LLC and that Ife was signing as a member of Odagbodo LLC. ***Id.*** at
119; Exhibit P-6 (property deed). In fact, according to the notary's seal, Ife
appeared before the Notary and declared that he was the sole member of
Odagbodo LLC, and, as the sole member, he had the authority to sign the
deed on behalf of Odagbodo LLC. Exhibit P-6 (property deed).

Within one month of closing on the Home, Buyers began experiencing
problems. For example, Buyers reported a problem with the back door and
Ife came to the Home to address it on December 14, 2017. ***See*** Exhibit P-4
(email exchanges). The Home was without heat for two weeks in December
2017 when the HVAC system malfunctioned and a window would not close.
N.T., 9/26/2023, at 129; ***see also*** Exhibit P-4 (Buyers' December 20, 2017

email to Kevin Toll ("Toll"), LLC Sellers' realtor, informing Toll of the HVAC malfunction and noting that when "the builder" was at the Home the previous week, Buyers overheard "him ask what the weird gargling noise coming from the HVAC unit in the back" was); *id.* (Buyers' December 20 and 28, 2017 emails to Toll informing him that neither the window company nor the siding company came to address a malfunctioning window as the "builder" and the "owner" had promised when he was at the Home the prior week).  The most significant problem, however, was extensive leaking throughout the Home causing interior damage and mold.  *Id.* at 101, 125-32, 136-37, 141, 143-44, 148, 161-68.

Buyers discovered the first leak in their bathroom on December 30, 2017.  *Id.* at 125.  When Buyers initially notified Toll, he responded, instructing them to use the Warranty.  *Id.*  at 131.  In response to an email from Buyers expressing concern that so many issues had arisen within the first month after closing, Toll forwarded an email from Jeune asking their agent to assure Buyers that "we stand behind the product 100%" and to be patient with them while they secured contractors to fix the various issues.  *Id.* at 133-34.  Jeune assured Buyers that they had no reason to forfeit their deposit or to take legal action because "we are willing to fix any issues with the property within reason."  Exhibit P-4 (email exchanges).  Ife was copied at his personal Gmail address.  N.T, 9/26/2023, at 133-34.

After Buyers found a second leak and noticed settling that cracked the tile in the bathroom and separated the kitchen countertop from the wall, the "sellers" visited the Home in January 2018 to see what they would need to do to address the problems. *Id.* at 137-39; *see also* Exhibit P-4 (email exchanges) (email from Buyers to Toll asking for an update following a visit from "the builders … last week to take a look at all of the issues"). From that point on, Buyers notified Jeune and Ife directly about the persistence of the problems. N.T., 9/26/2023, at 142-43; *see, e.g.,* Exhibit P-4 (Buyers' March 2, 2018 email to Ife informing him that the leaks remain unaddressed "over a month" since "the builders" "looked" at the windows and "said as soon as the Investors give him a green light, they can come out and fix the Issues"). In emails sent from his personal Gmail address on March 2, 2018, Ife promised the Buyers that "we" would send contractors to fix the continued leaking. *Id.* at 144; Exhibit P-4 (email exchanges). Although the LLC Sellers sent contractors who fixed several smaller problems, no contractor fixed the leaks. N.T., 9/26/2023, at 144.

In April 2018, Buyers notified Ife, Jeune, and Toll that the Home was now leaking in six places and developing mold. *Id.* at 145-48. Jeune and Ife hired a company to evaluate the mold. *See id.* at 150; Exhibit P-4 (April 10, 2018 email from Jeune: "We will engage a mold company to inspect the area and replace sheetrock once [roofer] confirms leak is fixed"); Exhibit P-33 (Servepro estimate for $8,950.65 in water mitigation and mold remediation

services addressed to "Ise Odajbodo" without mention of Odagbodo LLC). Buyers learned about the confirmation of mold by contacting the company on their own, as the LLC Sellers neither provided Buyers with the company's report nor remediated the mold. *Id.* At one point, a roofer appeared at the Home who wanted to patch drywall without addressing the underlying leaking and mold. *Id.* at 152-54.

In May 2018, in response to Buyers' continued requests to fix the leaks, mold, and water damage, including a plea to hire Servepro to provide mold remediation, Ife instructed the Buyers to use the Warranty that was provided as part of the sale to address any repairs. *Id.* at 157, 205. When Buyers contacted the provider of the Warranty, however, they learned that the purchased Warranty only covered limited items, such as outside sewer lines and repair or replacement for mechanical failures of systems and appliances. *Id.* at 158, 205-06; N.T, 9/27/2023, at 72-75. It did not cover improperly installed items or the construction of the Home. N.T, 9/26/2023, at 205-06; N.T., 9/27/2023, at 75-76.

At that point, Buyers submitted a claim to mediation in accordance with the Sales Agreement, but the LLC Sellers refused to participate or respond further to Buyers. N.T, 9/26/2023, at 159, 169, 226; N.T., 9/27/2023, at 108. Buyers hired an inspector to conduct a moisture envelope inspection of the Home, which confirmed water infiltration through multiple points. N.T, 9/26/2023, at 159, 226. Buyers, through counsel, sent the report, along with

a notice to cure, to the LLC Sellers. *Id.* Buyers then hired a contractor to remediate the water intrusion in the Home in the presence of a forensic structural engineer, which involved removing the "entire front of the house, all of the brick façade[, and] … all of the windows," removing a bump out on the Home, re-flashing the entire roof and all windows, replacing drywall in the master bedroom and bathroom, and redoing a bathroom shower that was leaking into the room below. N.T, 9/26/2023, at 173-77; N.T., 9/27/2023, at 9-13. In total, the inspections and remediation cost Buyers $77,511.60. N.T, 9/26/2023, at 179.

**Civil Action**

Buyers commenced the action in the trial court by writ of summons on May 14, 2019. Buyers filed their initial complaint on October 18, 2019. The initial complaint named Odagbodo LLC and Ife in his individual capacity but not Samuel. Buyers also brought claims against Jeune and various entities affiliated with him. Buyers amended their complaint twice. The second amended complaint, filed on December 10, 2021, named Samuel as a defendant for the first time and raised claims against Samuel, Ife, and Odagbodo LLC (collectively, the "Odagbodo Defendants"). It also raised claims against Jeune, Jeune LLC, J&L General Contractors, LLC ("the General Contractor"), and JP Holdings Group LLC (the "Holdings LLC") (collectively, the "Jeune Defendants").

In relevant part, the claims against the Odagbodo Defendants included (1) breach of contract, (2) breach of implied warranties of habitability and workmanship, (3) negligent misrepresentation, and (4) violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201.1-201.10.[1] *See* Second Amended Complaint, ¶¶ 73-158, 169-87; *see also* Buyers' Pretrial Memorandum at 5. Buyers averred the defendants

> acted together for the purpose of purchasing land, obtaining zoning approvals, installing improvements and infrastructure, marketing, advertising, developing, constructing, obtaining approval of the construction, and selling, the Home, such that these legal entities acted as a joint venture or common business enterprise and/or single entity and are jointly and severally liable for their individual and collective actions in connection with the Home.

*Id.*, ¶ 34.

Buyers also sought to pierce the corporate veils of the LLC Sellers, the General Contractor, and the Holdings LLC. *Id.*, ¶¶ 145-68. Regarding Samuel and Ife as individuals, Buyers averred that Samuel and Ife were principals and/or members of Odagbodo LLC, which was the "developer, seller, and/or

---

[1] Specifically, Buyers alleged that Samuel and the other Odagbodo Defendants represented that the Home had characteristics, use benefits, or qualities that it did not have, 73 Pa.C.S. § 201-2(4)(v); represented that the Home was of a "particular standard, quality or grade" when it was of another, 73 Pa.C.S. § 201-2(4)(vii); made repairs, improvements, or replacements on the Home that was "of a nature or quality inferior to or below the standard that was agreed to in writing," 73 Pa.C.S. § 201-2(4)(xvi); and engaged in "fraudulent or deceptive conduct which create[d] a likelihood of confusion or misunderstanding," 73 Pa.C.S. § 201-2(4)(xxi).

builder of the Home"; that Samuel and Ife made personal representations regarding the Home's quality; that Samuel and Ife "participated in, controlled, and benefited from the construction, sale, and marketing" of the Home; and that Samuel and Ife "disregarded the corporate form" of Odagbodo LLC "to insulate themselves from potential liability" for the "development, design, marketing, construction, sale and/or warranty of the Home." *Id.*, ¶¶ 160-66. According to Buyers, it is "just and proper" to pierce Odagbodo LLC's corporate veil "arising from the unfair trade practices and negligent misrepresentations" of Samuel and Ife and their "intentional, fraudulent, deceptive, confusing or otherwise misleading conduct" regarding the corporate structure. *Id.*, ¶¶ 166-68.

Following their failure to file an answer or otherwise respond to the second amended complaint, the trial court entered default judgment against Odagbodo LLC on June 21, 2021, and against Samuel and Ife on May 26, 2022.[2] Over the course of 2021 and 2022, the trial court entered default judgment against the Jeune Defendants.

Approximately one month after the entry of default judgment against Samuel and Ife, Attorney Jonathan Sobel entered his appearance and filed a

_____

[2] Buyers' second amended complaint had named several other purported entities and default judgment was entered against them: Oagbodo Investments LLC, Odabbodo Investments, LLC, and Odaghodo Investments LLC. It is unclear whether these entities exist or whether they were Buyers' attempts to capture varied spellings of Odagbodo LLC.

petition strike or open the default judgment against the Odagbodo Defendants. Agreeing that service had been deficient, the trial court struck the judgment against the Odagbodo Defendants on September 10, 2022.

Thereafter, the Odagbodo Defendants filed an answer and new matter to Buyers' second amended complaint. Among other affirmative defenses, the Odagbodo Defendants asserted the statute of limitations as new matter. *See* Odagbodo Defendants' Answer and New Matter, 11/10/2022, ¶ 14.

Following discovery, the parties proceeded to a two-day bench trial on September 26 and 27, 2023. The Odagbodo Defendants were represented by Attorney Sobol. Samuel was present but Ife did not appear for trial.[3]

In addition to witnesses establishing the aforementioned facts, Buyers presented the testimony of a forensic structural engineer, who testified that the Home had been constructed defectively and violated code in several respects, including problems with the roof, the windows, and a door. N.T., 9/26/2024, at 39-98.

Buyers called Samuel as a hostile witness. According to Samuel, he and his brother Ife formed Odagbodo LLC in 2013 for the purpose of investing in, purchasing, and selling houses in Philadelphia. N.T., 9/27/2024, at 27, 124. Samuel testified that he and Ife each own fifty percent of Odagbodo LLC and

---

[3] In addition to serving as a trial on the liability of the Odagbodo Defendants, the trial also addressed damages as it related to the Jeune Defendants against whom default judgment had been entered. Jeune, who proceeded pro se with standby counsel, did not present evidence. N.T., 9/27/2024, at 174-81.

run the day-to-day operations together as managing partners without any hierarchy. *Id.* at 26, 33, 115. Odagbodo LLC has no employees. *Id.* at 34. Its operating agreement listed Ife and Samuel as the managing partners and listed both their addresses as an apartment on N. 7th Street where Ife once lived as a student in college and where Samuel has never lived. *Id.* at 115-16. Odagbodo LLC has no formal headquarters or brick and mortar location, and Samuel and Ife do their work from "absolutely anywhere," such as coffee shops. *Id.* at 46. The brothers use cell phones, iPads, and computers registered under their personal names, or the names of other businesses they own, to conduct Odagbodo LLC's business. *Id.* at 47. Samuel is partial owner of four other companies in addition to Odagbodo LLC, and he uses his devices interchangeably for all entities. *Id.* at 47-51.

Samuel, Ife, and Jeune agreed that their respective investment LLCs would jointly purchase the property in question; the General Contractor, which was a construction management company owned by Jeune, would hire subcontractors to tear down an existing home and construct the Home; and the LLC Sellers would market and sell the Home through real estate agent Kevin Toll ("Toll"). *Id.* at 127-32, 136. This investment project was Samuel's first time selling new construction. *Id.* at 148. Odagbodo LLC did not have a contract with the General Contractor. *Id.* at 132. Samuel does not know if Jeune LLC had a written contract with the General Contractor or if the General

Contractor had written contracts with the subcontractors constructing the Home. *Id.* at 132-33.

Samuel and Ife visited the Home several times during construction and "made inspections" to "visually look at the work as it progressed." *Id.* at 52, 117-18, 131. Neither Samuel nor Ife have training on code compliance and relied upon the city's Licensing and Inspections Department's permitting process and the professionals completing the work. *See id.* Samuel did not know why he was the one who completed the Disclosure. *Id.* at 52-53, 135. He selected "yes" to indicate that the "seller" possessed "expertise in contracting, engineering, architecture, environmental assessment of other areas related to the construction and conditions of the property and its improvements." *Id.* at 57. He intended this representation to refer to Jeune LLC only because neither Samuel nor Ife are licensed contractors. *Id.* at 28, 57-58. The Disclosure also indicated that the "seller" was a "real estate licensee." *Id.* at 58. Samuel's testimony was equivocal as to whom this referred. Initially, he testified that this referred to his Maryland real estate license but later he professed his belief that he only became a licensed realtor after the sale of the Home. *Id.* at 58, 133-34, 148-49. At another point he said it "might" have been Ife's license that he was referencing but he did not know whether Ife has his real estate license. *Id.* at 148-149.

Samuel testified that Ife was more involved with the Home than he was, as he lived in Maryland and never met Buyers. *Id.* at 79, 133, 140-41.

Samuel acknowledged that there were "problems" with the Home "that have come up over time." *Id.* at 60. He emphasized that Buyers hired an inspector to conduct an inspection before closing but acknowledged that the inspector did not remove walls and that he did not hire his own expert to refute Buyers' contention that the problems stemmed from the construction of the Home. *See id.* at 60, 86-87. Samuel testified that Buyers continued to reach out to the General Contractor after the sale "to do repairs on the property as if … they still owned it" and "Ife was involved in a lot" of these communications. *Id.* at 84. He opined that Jeune and Ife went "above and beyond" the items on the addendum post-sale and implied that Buyers unreasonably expected others to address problems in the home that they now owned. *See id.* at 95-96.

Upon receiving Buyers' complaint, on April 22, 2022, Samuel testified that he wrote a letter to Buyers' counsel with Odagbodo LLC's name at the top and with his role as "partner" listed under his signature. *Id.* at 140, 144, 151-54. After referencing Buyers' status as first-time home buyers and the transfer of ownership from the LLC Sellers to Buyers, Samuel told Buyers that part of the responsibility of owning a home was to address repairs that a home needed and insisted that Odagbodo LLC was no longer responsible for making any repairs. *See id.* at 151-54. Samuel referred Buyers to the "comprehensive home warranty" provided through Long & Foster, despite this

Warranty plainly not covering the majority of the problems that Buyers were experiencing. *Id.* at 54, 68, 73-76.

At the conclusion of Buyers' case in chief, the Odagbodo Defendants moved for a directed verdict on all counts against Samuel and Ife individually, arguing that Buyers did not establish a basis to pierce the corporate veil of Odagbodo LLC, which the trial court denied. *Id.* at 170-74. The Odagbodo Defendants did not present any evidence to defend against the claims. *Id.* at 175.

After granting the defense request to file a post-trial brief,[4] on January 10, 2024, the trial court entered an order finding in favor of Buyers and against the Odagbodo Defendants and Jeune Defendants jointly and severally in the total amount of $216,000,[5] divided into economic damages of $70,500, attorneys' fees of $75,000, and double damages of $70,500 pursuant to section 9.2 of the UTPCPL.[6]

---

[4] The Odagbodo Defendants requested that the trial court permit the parties to file post-trial briefs. Despite the defense request, Buyers were the only party who submitted a brief.

[5] The trial court did not issue specific findings regarding its basis for liability except for referencing the claims that it considered at trial in its opinion: "breach of contract, breach of an implied warranty, negligent misrepresentation, and an [UTPCPL] claim." *See* Trial Court Opinion, 12/4/2023, at 4.

[6] The trial court's original order referred to all defendants but inadvertently omitted Odagbodo LLC's name in a list of the defendants. In response to Buyers' post-trial motion, the trial court issued a clarified and corrected order
*(Footnote Continued Next Page)*

The Odagbodo Defendants filed a post-trial motion contesting the sufficiency and weight of the evidence to support piercing the corporate veil and awarding double damages, as well as the amount of attorneys' fees. After ordering and considering the parties' briefs concerning the attorneys' fees award, the trial court entered an order on May 13, 2024, reaffirming its earlier decision, as corrected, to award $75,000 in attorneys' fees. On May 14, 2024, the trial court entered an order expressly denying the post-trial motion filed by the Odagbodo Defendants. The trial court entered judgment against the Odagbodo Defendants and Jeune Defendants on July 24, 2024.

## Appeal

On August 21, 2024, Samuel filed a notice of appeal pro se.[7] Both Samuel and the trial court complied with Pennsylvania Rule of Appellate

_____

on February 20, 2024, specifying that it found Samuel, Ife, Odagbodo LLC, Jeune, Jeune LLC, the General Contractor, and the Holdings LLC jointly and severally liable for the $216,000 award to the Buyers.

[7] Attorney Sobol had filed a motion to withdraw from representation, but the motion was still pending at the time Samuel filed the notice of appeal. On September 10, 2024, following a hearing, the trial court granted Attorney Sobol's motion to withdraw. Generally, this Court prohibits hybrid representation and treats pro se filings by represented parties as legal nullities. *S.C.B. v. J.S.B.*, 218 A.3d 905, 911 n.4 (Pa. Super. 2019). Notices of appeal, however, constitute an exception to this rule because Article 5, § 9 of the Pennsylvania Constitution provides a right of appeal to appellate courts. *Commonwealth v. Williams*, 151 A.3d 621, 624 (Pa. Super. 2016). Thus, instead of treating the appeal as a legal nullity, this Court dockets the pro se notice of appeal despite the litigant's concurrent legal representation. *Id.*

Procedure 1925. Samuel presents seven issues for our review, which we reorder for ease of disposition:

1. Whether the trial court erred in allowing breach of contract and negligence claims against [Samuel] that were barred by the statute of limitations[?]

2. Whether the trial court improperly pierced the corporate veil, holding [Samuel] personally liable without sufficient legal justification[?]

3. Whether the trial court misapplied the Participation Theory in holding [Samuel] personally liable without evidence of direct misconduct[?]

4. Whether the trial court misapplied the UTPCPL by imposing liability without evidence of fraudulent intent or reliance by the plaintiffs[?]

5. Whether the damages awarded, including treble damages and attorney's fees, were excessive and unsupported by the evidence[?]

6. Whether the trial court erred in relying on false statements in [the Buyers'] post-trial brief that misrepresented [Samuel's] role in the transaction[?]

7. Whether newly discovered evidence confirms [Samuel] had no direct involvement in the transaction, warranting reversal of the judgment[?]

Samuel's Brief at 1-2 (numbering supplied).[8, 9]

In reviewing these issues, we abide by the following standard of review:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial court must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary. The trial court's conclusions of law on appeal

_____

[8] Samuel's brief fails to comply with our rules of appellate procedure. It lacks page numbers, *see* Pa.R.A.P. 2173, a table of citations, *see* Pa.R.A.P. 2174(b), and a statement of the scope and standard of review, *see* Pa.R.A.P. 2111(a)(3). Although Samuel's brief includes a statement of the case, it fails to comply with Rule 2117 in several respects, including its failure to include any citations to the record and to present all facts necessary to determine the points in controversy. *See* Pa.R.A.P. 2117. "[A]lthough this Court is willing to construe liberally materials filed by a pro se litigant, pro se status generally confers no special benefit upon an appellant." *Commonwealth v. Lyons*, 833 A.2d 245, 251-52 (Pa. Super. 2003). "[A] pro se litigant must comply with the procedural rules set forth in the Pennsylvania Rules of the Court." *Commonwealth v. Freeland*, 106 A.3d 768, 776 (Pa. Super. 2014) (quoting *Lyons*, 833 A.2d at 252). While the brief's deficiencies make our task here more difficult, it does not substantially impede our appellate review and we decline to find waiver on this basis.

[9] Samuel concedes, in an application to file a reply brief nunc pro tunc, that he did not file his reply brief by the deadline established by Rule 2185(a)(1). He attached the reply brief to the application and asked that this Court accept it. The reply brief is patently untimely, but we grant Samuel's application because it helps to clarify his argument, and we discern no prejudice to Buyers. We do not, however, consider the documents he appended to his reply brief, as they are not part of the certified record. *See Commonwealth v. Rush*, 959 A.2d 945, 949 (Pa. Super. 2008) (explaining that this Court may "rely only on facts and documents in the certified record" during our review of a case and cannot rely on "assertions in an appellate brief" of facts that were not introduced in the trial court).

originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case.

*El-Gharbaoui v. Ajayi*, 260 A.3d 944, 958 (Pa. Super. 2021) (citation omitted).

### Statute of Limitations

Samuel argues that Buyers' claims against him were barred by the four-year and two-year statutes of limitations applicable to breach of contract and negligence claims, respectively. Samuel's Brief at 3 (citing 42 Pa.C.S. §§ 5524, 5525). Samuel maintains that Buyers discovered the alleged defects around December 2017 and January 2018, but only added Samuel as a defendant in January 2022, "well after the limitations period had expired." *Id.*[10]

We are unable to address Samuel's issue on the merits because he failed to preserve it for appellate review. The statute of limitations is an affirmative defense, which is waivable. Pa.R.C.P. 1030(a); *Driscoll v. Arena*, 213 A.3d 253, 257 (Pa. Super. 2019). Although the Odagbodo Defendants raised the statute of limitations in new matter, they only did so by general averment. *See* Odagbodo Defendants' Answer and New Matter at ¶ 14. By failing to plead facts to support the defense in accordance with Rule 1030(a), Samuel

---

[10] Samuel's argument pertains only to the tort and contract claims, as a UTPCPL claim is subject to the six-year statute of limitations under 42 Pa.C.S. § 5527(6). *See Morse v. Fisher Asset Mgmt., LLC*, 206 A.3d 521, 526 (Pa. Super. 2019).

waived this affirmative defense. *See El-Gharbaoui*, 260 A.3d at 963. Further, the Odagbodo Defendants did not raise the defense at trial or in their post-trial motion. By not giving the trial court the opportunity to rule upon the defense in the first instance or to correct an erroneous ruling prior to appeal, Samuel has failed to preserve this issue for our appellate review. *See* Pa.R.Civ.P. 227.1; *Bd. of Supervisors of Willistown Twp. v. Main Line Gardens, Inc.*, 155 A.3d 39, 44 (Pa. 2017). Finally, Samuel waived this issue by failing to include it in his concise statement of matters complained of on appeal. Pa.R.A.P. 1925(b)(iv)(ii); *Andrews v. Cross Atl. Cap. Partners, Inc.*, 158 A.3d 123, 129 (Pa. Super. 2017).[11] Each of these three bases constitute waiver and prevent this Court from addressing Samuel's claim on the merits.

**Piercing the Corporate Veil and Participation Theory**

Argument

In his second and third issues, Samuel contends that the trial court erred by imposing individual liability upon him for actions he took as a member of Odagbodo LLC under the legal theories of piercing the corporate veil and participation. Samuel argues that Pennsylvania law "requires evidence of

---

[11] Samuel argues in his reply brief that he expressly preserved this claim in his concise statement, but he does not pinpoint where he believes he has done so. Samuel's Reply Brief at 2. Our review of the concise statement filed pro se by Samuel reveals nothing that expressly or implicitly preserved this issue for our review.

fraud, illegality, or misuse of the corporate form" to pierce the corporate veil, but the "trial court's opinion fails to identify any such evidence." Samuel's Brief at 3 (citing ***Vill. at Camelback Prop. Owners Assn. Inc. v. Carr***, 538 A.2d 528 (Pa. Super. 1988)). Samuel contends that the trial court disregarded the corporate protection of Odagbodo LLC without evidence of commingling of assets, undercapitalization, or fraudulent conduct, which he contends was a prerequisite to veil piercing. ***Id.*** at 4. Samuel insists that Odagbodo LLC "maintained corporate formalities" and "operated as a legitimate business entity." ***Id.***

Additionally, Samuel argues that pursuant to the participation theory espoused in ***Wicks v. Milzoco Builders***, 470 A.2d 86 (Pa. 1984), the trial court erred in holding him liable "solely based on his ownership position in Odagbodo Investments, LLC, without evidence of direct wrongdoing." Samuel's Brief at 4. In contrast to a contractor/owner who incurred individual liability under the participation theory by making "ongoing false assurances" that he would fix defects in new construction that he built, sold, and warranted to buyers in ***Sereda v. Ctr. City Acquisitions, LLC***, 222 A.3d 1161 (Pa. Super. 2019), Samuel argues that he had "no direct dealings with the buyers, did not coordinate repairs, and had no construction oversight role." Samuel's Reply Brief at 2. Samuel acknowledges that he referred Buyers to the warranty provider after they instituted litigation but argues this action was "legal and appropriate" and not "deceptive." ***Id.***

Piercing the Corporate Veil

Pursuant to the Pennsylvania Uniform Limited Liability Company Act of 2016, an LLC "is an entity distinct from its member or members."  15 Pa.C.S. § 8818(a).  Ordinarily, courts honor a member's election to limit personal liability through the creation of an LLC.  ***See Mortimer v. McCool***, 255 A.3d 261, 278 (Pa. 2021); ***see also*** 15 Pa.C.S. § 8834(a) ("A member … is not personally liable, directly or indirectly, by way of contribution or otherwise, for a debt, obligation or other liability of the company solely by reason of being or acting as a member or manager.").  As such, when presented with an attempt to pierce the veil of an LLC or other corporate entity, courts "must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception." ***Lumax Industries, Inc. v. Aultman***, 669 A.2d 893, 895 (Pa. 1995).

One such exception arises when an individual or corporate owner of an entity controls the entity as its "alter ego" to such an extent that the entity's acts are truly the controlling owner's acts.  ***Sereda***, 222 A.3d at 1168.  This exception is premised upon the notion that it is inequitable to provide the benefit of limited liability to an individual who abuses the formalities of his chosen corporate form.  ***See Mortimer***, 255 A.3d at 278 ("Once an individual, individuals, or an entity elect to establish a corporation to gain the benefits of that business form, such persons and entities are not free to blur the lines of the capacity in which they act as it may suit them.") (citation and quotation

marks omitted). When an owner misuses the corporate form to derive improper personal gain or advantage, the owner effectively pierces the corporate veil himself, which then permits a court to "reach through the veil already torn by the owner's abuses" and disregard the fiction of the separate corporate identity as a matter of equity. *Id.* Notably, a "request to pierce the corporate veil is not an independent cause of action, but rather is a means of imposing liability established in an underlying cause of action, such as tort or breach of contract, against another." ***Commonwealth v. Golden Gate Nat'l Senior Care LLC***, 194 A.3d 1010, 1035 (Pa. 2018).

A court may disregard the corporate form "whenever justice or public policy demand, such as when the corporate form has been used to defeat public convenience, justify wrong, protect fraud, or defend crime." ***Mortimer***, 255 A.3d at 278. A showing of fraud is not required; "Pennsylvania courts will disregard the corporate form whenever it is necessary to avoid injustice, and so long as "the rights of innocent parties are not prejudiced nor the theory of corporate entity rendered useless." ***Id.***

The law of piercing is imprecise because it is based upon broad equitable principles designed to be flexible. ***Id.*** at 286. All or some of the factors that the Court discussed in ***Lumax*** may be helpful to guide a court's veil-piercing inquiry: "undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs[,] and use of the corporate form to perpetrate a fraud." ***Mortimer***, 255 A.3d at 268 (quoting

*Lumax*, 669 A.2d at 895); *but see* 15 Pa.C.S. § 8106 ("The failure of a … limited liability company to observe formalities relating to the exercise of its powers or management of its activities and affairs is not a ground for imposing liability on a partner, member or manager of the entity for a debt, obligation or other liability of the entity.").

The *Mortimer* Court focused the ultimate inquiry, however, on two main considerations. *See Mortimer*, 255 A.3d at 286-87 (citing Franklin A. Gevurtz, *Piercing Piercing: An Attempt to Lift the Veil of Confusion Surrounding the Doctrine of Piercing the Corporate Veil*, 76 Or. L. Rev. 853, 907 (1997)). First, whether there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *Id.* Second, whether "adherence to the corporate fiction under the circumstances … sanction fraud or promote injustice." *Id.* The consideration of whether there is a "fraud, wrong, or injustice" is a "restatement of the basic starting point that piercing is an equitable remedy used to prevent injustice" that guides the court on **when** to pierce the corporate veil. *Id.* at 287. The "control element" of who or what is controlling the entity tells a court **against whom** the veil should be pierced. *Id.*

Participation Theory

The participation theory imposes liability upon a corporate officer who personally participated in tortious acts committed on behalf of corporations.

- 23 -

*Wicks*, 470 A.2d at 90. The participation theory stands in contrast to the general rule that

> an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

*Id.*

The participation theory is distinct from veil piercing pursuant to the alter ego theory. *Id.* at 89. Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. *Id.* at 89-90. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner, regardless of the legitimacy of the corporation. *Id.* at 90. Because liability under the participation theory "attaches only where the corporate officer is an actor who participates in the wrongful acts," the officer may be held liable for misfeasance but not mere nonfeasance. *See id.* (citing *Cohen v. Maus*, 147 A. 103, 104 (Pa. 1929), for the proposition that corporate directors are not individually liable for a conversion by the corporation and its general manager about which they knew nothing simply because they might have discovered the conversion by examining the corporate records).

The basis for individual liability for participation in corporate torts is "not the breach of the contract with the corporation but rather the breach of an independent legal obligation to avoid injury to the plaintiff." *Loeffler v.*

*McShane*, 539 A.2d 876, 879 (Pa. Super. 1988). "Such an obligation will often exist precisely because the law imposes special duties on parties who deal with one another in a business setting." *Id.* (affirming a trial court's imposition of liability upon a "principal corporate officer of [a] title insurance company" because the officer owed the mortgagors a duty to use reasonable care in handling their financial resources).

Trial Court Opinion

The trial court defended its decision to pierce the corporate veil of Odagbodo LLC and hold Samuel liable under the participation theory, finding that Samuel "should not be allowed to hide behind the LLC" while selling Buyers "a property that was defectively built." *See* Trial Court Opinion, 12/6/2024, at 8-9. According to the trial court, "all of the actions of the partners of the LLC suggest that it is an LLC only in name." *Id.*

In support of its decision, the trial court highlighted Samuel and Ife's equal ownership and management of Odagbodo LLC; the LLC's lack of formal headquarters; Samuel and Ife's performance of work at places like coffee shops; the use of laptops and phones registered to the brothers as individuals or to other entities owned by the brothers; the use of personal email addresses to communicate with clients; and the joint investment and participation with the Jeune Defendants. *See id*. Referring to the "Defendants" and "sellers" without distinguishing between the specific actors, the trial court also emphasized the clear contractual obligations to provide a new construction

warranty and to complete the tax abatement process; the breaches of these obligations; the awareness that the Home had water intrusion problems causing mold; the repeated promises to fix the "major issues" in the Home; the offer of "performative" help that did not solve the Home's problems and allowed damages to continue to accrue; the provision of the Warranty and repeated direction to use the provided Warranty to address the construction defects despite the Warranty's limited scope; and the eventual termination of communications with Buyers regarding the defects. *See id.* In an apparent reference to Samuel's post-complaint letter to Buyers' counsel in 2022, the court chastised Samuel for instructing Buyers

> to take responsibility for being a homeowner, while he, as one of the sellers of the property, failed to provide the contracted warranty, to address the repairs even though someone came out to take a look at the damages, to provide [Buyers] with a house that was built to code, and lastly continued to direct [Buyers] to use a warranty that was nothing but an appliance warranty.

*Id.* at 9.

## Analysis

Although the record supports the trial court's factual findings insofar as it established that one or more of the defendants engaged in the referenced actions, we are troubled by the trial court's lack of specificity regarding which defendant was the actor, particularly because it relied upon this analysis to support its decision to hold Samuel liable under the participation theory. Samuel's direct involvement in this project was limited to his signing of the Disclosure and 2022 letter directing the Buyers to the insufficient warranty.

As we explain in more detail in our analysis of the UTPCPL claim, Samuel's actions contributed to the negligent misrepresentation and deception under the UTPCPL in this case, but they do not necessarily constitute misfeasance standing alone. Part of what makes Samuel's actions problematic is his nonfeasance in reliance upon Ife and Jeune. Because the participation theory requires active misfeasance by a corporate officer who participates in the wrongful acts, *see Wicks*, 470 A.2d at 90, and our review of the record indicates that Samuel's personal role straddled the line between misfeasance and nonfeasance, we conclude that the trial court erred by holding Samuel liable under the participation theory.

As for piercing the corporate veil, we find the trial court's rationale in support of its legal conclusion that Samuel and Ife "hid[] behind the LLC" to be somewhat amorphous. The trial court alludes to Samuel and Ife's intermingling of personal and corporate interests but mainly focuses on their use of the LLC to sell a shoddy product, without making any findings of fraud or their intent. Instead of explaining why justice or public policy demanded that it take the extraordinary step of reaching through Odagbodo LLC's veil to hold the members of the LLC liable in their individual capacities, much of the trial court's analysis emphasizes the facts that support liability generally under Buyers' various claims. That the facts support the basis for a corporate entity's liability does not inherently demonstrate why "adherence to the corporate fiction under the circumstances" would "sanction fraud or promote

injustice." *See Mortimer*, 255 A.3d at 286-87. To invoke the equitable remedy of piercing the corporate veil, the injustice at issue is not merely the entity's tortious or deceptive acts or its contractual breach—the entity can be held liable for such acts. Rather, the injustice occurs when a corporate entity is liable, but there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist," and, given the liability and the unity of interest and ownership, pretending that the corporation is separate from the individual and insulating the individual from liability "would sanction fraud or promote injustice." *See id.*

Some of the facts emphasized by the trial court are not persuasive. That Samuel and Ife worked out of coffee shops in a modern society that embraces remote work is not significant. Nor is the lack of a formal headquarters indicative of alter ego, because an LLC may satisfy the requirement of maintaining a registered office in Pennsylvania by using a commercial registered office provider. *See* 15 Pa.C.S. §§ 109(a)(1), 8825(a), (c).[12]

_____

[12] A commercial registered office provider is an association "engaged in the business of maintaining registered offices in this Commonwealth for corporations or other associations," which files "a statement of address of commercial registered office executed by the representing association or a division thereof" with the Department of State indicating where "communications and other matters directed to each person represented by it may be delivered." 15 Pa.C.S. § 109(b). Neither the certified record nor the parties' briefs indicate whether Odagbodo LLC used a commercial registered office provider.

Nevertheless, the certified record does support the notion that Samuel and Ife used the corporate form to defeat public convenience and justify wrong. Samuel and Ife did not consistently maintain separation between the LLC and themselves as individuals; instead, based on the record before us, it appears they invoked the LLC when it suited them and otherwise did not. Although the bodies of the Disclosure, Sales Agreement, and Addendum list the "seller" as Odagbodo LLC and Jeune LLC, Samuel signed the Disclosure and Ife signed the Sales Agreement and Addendum individually and without referencing Odagbodo LLC or their roles within the LLC. *See* Exhibits P-2, P2-A (Sales Agreement and Disclosure). Because Jeune signed in the same manner, it was not even clear which individual was signing on behalf of each LLC. In contrast, Samuel's 2022 post-complaint letter to Buyers' counsel doubling down on Ife's prior direction to Buyers to use the insufficient Warranty clearly specified that he was sending the letter as a member of Odagbodo LLC while expressly wielding the shield of the LLC. *See* N.T., 9/27/2023, at 140, 144, 151-54. Likewise, when Ife signed the deed to the property, he indicated that he did so as a member of the LLC. *See* Exhibit P-6 (property deed). In fact, according to the notary's seal, he declared that he was the sole member and had the authority as sole member to sign the deed on behalf of Odagbodo LLC—assertions that contradict Samuel's testimony that he was a member, fifty percent owner and shared operating responsibilities of Odagbodo LLC. *See id.*; N.T., 9/27/2024, at 26, 33, 115.

Odagbodo LLC required minimal equipment, but the equipment it did have—cell phones and computers—were registered to Samuel and Ife as individuals or to Samuel's other businesses and Samuel used the equipment interchangeably to conduct Odagbodo LLC's business. *See* N.T., 9/27/2023, at 47-51. Samuel delegated much of the operations related to the Home to Ife and claimed to have no awareness of Ife's actions, and yet Samuel personally signed the Disclosure and issued the letter to Buyers on behalf of Odagbodo LLC, reinforcing statements that Ife also made (i.e., to rely on the deficient Warranty). *See id.* at 79, 84, 133, 140-41, 144, 151-54. Using his personal Gmail address without delineating that he was communicating as member of Odagbodo LLC, Ife (along with Jeune) promised Buyers he would fix the problems and urged Buyers not to take their money back from escrow or to take legal action. *See* N.T., 9/26/2023, at 133-34, 144, 150; N.T., 9/27/2023, at 84, 95-96; Exhibit P-4 (email exchanges). Neither Ife, Jeune, nor Samuel rectified the major defects with the property, and told Buyers instead to rely upon the Warranty that fell far short of what they had agreed to provide, to keep Buyers in the deal.

Viewing the evidence in the light most favorable to Buyers, as our standard of review requires, we conclude that there is sufficient evidence in the record supporting the trial court's legal conclusion that Samuel and Ife "blur[red] the lines of the capacity in which they act as it may suit them," that "unity of interest and ownership" were "substantially intermingled," and that

"adherence to the corporate fiction" under these circumstances promotes injustice. **See Mortimer**, 255 A.3d at 286-87. Therefore, although the trial court erred in holding Samuel personally liable under the participation theory, we conclude that the trial court did not err by piercing the corporate veil to hold Samuel individually liable on the tort, breach of contract, and UTPCL claims.

## UTPCPL

Samuel further argues that the UTPCPL requires deceptive conduct or misrepresentations relied upon by Buyers, and that they failed to demonstrate that he personally engaged in any deceptive conduct or made misrepresentations that they relied upon. **See** Samuel's Brief at 3-4; Samuel's Reply Brief at 2. In his reply brief, Samuel argues that the Disclosure "was a standard form believed to be accurate when signed." Samuel's Reply Brief at 2. He argues that his letter referring Buyers to the Warranty was a "legal and appropriate action" that was not deceptive, and emphasizes that the "cited warranty was a third-party appliance warranty—not related to construction, and not issued by [Samuel] personally or the [Odagbodo LLC]." **Id.** (emphasis omitted).[13] Samuel further argues that the trial court erred by

_____

[13] He also asserts that "[r]ealtor Kevin Toll, who handled the sale, has confirmed that [Samuel] was not involved in sales negotiations or disclosures." **Id.** Samuel does not cite to the record to support this contention, and the record reflects that Toll did not testify at trial. Instead, support for this contention is contained in an affidavit signed by Toll that is
*(Footnote Continued Next Page)*

awarding an excessive amount in damages ($216,000) without justification, particularly when the Buyers' actual out-of-pocket costs totaled only $64,750. Samuel's Brief at 4.

The "UTPCPL is Pennsylvania's consumer protection law." *Sereda*, 222 A.3d at 1171. It prohibits "unfair or deceptive acts or practices." 73 P.S. § 201-2(4). The UTPCPL "is a remedial statute that should be construed broadly in order to comport with the legislative will to eradicate unscrupulous business practices." *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 641 (2021). To establish a claim under the UTPCPL, a person must demonstrate that:

> (1) they purchased or leased "goods or services primarily for a personal, family, or household purpose"; (2) they suffered an "ascertainable loss of money or property"; (3) the loss occurred "as a result of the use or employment by a vendor of a method, act, or practice declared unlawful by" the [UTPCPL]; and (4) the consumer justifiably relied upon the unfair or deceptive business practice when making the purchasing decision.

*Id.* at 646 (quoting 73 P.S. §§ 201-8, 201-9.2(a)).

One such unfair or deceptive act or practice is the provision relied upon by the trial court, known as the "catch-all" provision. *See* Trial Court Opinion, 12/6/2024, at 11. This provision "prohibits anyone who advertises, sells, or distributes good or services from '[e]ngaging in any … fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding'" during

---

not part of the record. Furthermore, the alleged affidavit is belied by the record, as Samuel acknowledged signing the Disclosure on behalf of the Odagbodo LLC. We address Samuel's argument regarding the affidavit in our discussion of Samuel's argument regarding newly discovered evidence.

a transaction." *Gregg*, 245 A.3d at 640 n.1 (quoting 73 P.S. § 201-2(4)(xxi)).

The catch-all provision "imposes liability on commercial vendors who engage

in conduct that has the potential to deceive and which creates a likelihood of

confusion or misunderstanding." *Id.* at 649. The state of mind of the

commercial vendor is not relevant; liability ensues to a vendor who engages

in "deceptive conduct during a consumer transaction that creates a likelihood

of confusion or misunderstanding and upon which the consumer relies to his

or her financial detriment," regardless of whether the vendor acted

"intentionally (as in a fraudulent misrepresentation), carelessly (as in a

negligent misrepresentation), or with the utmost care (as in strict liability)."

*Id.* (citation omitted).

> [C]onsumers may be especially reliant upon a vendor's specialized
> skill, training, and experience in matters with which consumers
> have little or no expertise[,] … the legislature has [thus] placed
> the duty of UTPCPL compliance squarely and solely on vendors;
> they are not to engage in deceitful conduct and have no legally
> cognizable excuse, if they do.

*Id.* at 588-89.

In the instant case, the trial court concluded that the "sellers" engaged

in unfair or deceptive acts or practices by:

- providing a Home that "was so poorly built that fixtures were separating
  from where they were installed, windows would not shut, the roof was
  defective, leaks were constant, and mold started to grow";

- the "false promises that they would send contractors to take care of the
  issues with the house" that developed within the first month of
  ownership and continued to snowball until mold started developing from
  the water intrusions;

- sending a company to check on the mold problem but doing nothing to abate it;

- failing to provide a one-year builder's warranty in accordance with the addendum to the Sales Agreement; and

- continually directing Buyers to use the provided Warranty that "was essentially an appliance warranty."

***See*** Trial Court Opinion, 12/6/2024, at 11.

Because the trial court's analysis combines the individuals and entities together by referring to the "sellers" generically without specifying who engaged in a particular act, it is unclear whether the trial court determined that Samuel's individual liability under the UTPCPL stems from his personal actions or the acts of the entities vis a vis alter ego veil piercing. Focusing solely upon the acts in which Samuel was personally engaged, however, we conclude that the trial court did not err by determining that Samuel violated the UTPCPL.

Although the record reflects that Samuel's personal participation in this investment project was more limited than Ife or Jeune's, it did not occur in a vacuum. Despite Samuel's attempt on appeal to draw a sharp line separating the Odagbodo Defendants on side and the Jeune Defendants on the other, and then crafting an additional division between him and Ife, the facts produced at trial show that none of the entities and individuals operated with such precision while developing, constructing, marketing, selling, and warranting the Home. Samuel formed a two-member LLC with his brother to develop and sell real estate and allowed Ife to take the reins in developing and selling the

Home on behalf of Odagbodo LLC. Samuel entrusted his brother to conduct Odagbodo LLC's affairs without knowing whether Ife had his real estate license or any relevant training. Despite the large scope of the joint project, which included demolishing and completely reconstructing a rowhouse, Odagbodo LLC did not enter into a general contracting agreement for the construction of the Home and entirely entrusted the construction to Jeune and his companies. To Buyers, the LLC Sellers and associated entities and individuals presented themselves as a team, not separate companies. *See* N.T., 9/26/2023, at 133, 143-58. Although the Buyers knew that there were two LLCs who co-owned the Home, *see id.* at 189, Jeune and Ife interchangeably responded to the Buyers' complaints about the Home's defects and promised to rectify the problems without any division as to responsibility. *See id.* at 66-67, 76-77, 81, 84; Exhibit P-4 (email exchanges).

By signing the Disclosure with his individual name, Samuel assured the Buyers that the "seller" (which included him) had expertise and that there were no material defects of which the "seller" was aware, lending further credence to the other defendants' prior marketing of a home constructed and sold by experienced contractors. What was a "standard form" to him in reality was a representation to Buyers within the context of the marketplace for the Home that he and the other defendants created. Samuel's belief as to the accuracy of his representations in the form Disclosure is irrelevant. *See Gregg*, 245 A.3d at 652 ("Under the catch-all provision of the [UTPCPL], the

actor's state of mind as to either the truth or falsity of the representation or the effect that the misrepresentation will have on the consumer is irrelevant.").[14]

We discern no error in the trial court's determination that Buyers reasonably relied upon Samuel's representation in the Disclosure, and such representation occurred alongside the representations of the others involved in the project. These representations included that Buyers were buying a brand-new home that was built in workmanlike manner by sellers/contractors who had expertise, and that the sellers/contractors stood by their work to such an extent that, if problems arose, they would rectify them through prompt repair and purchasing a builders' warranty to back up their work for one year. *See Sereda*, 222 A.3d at 1172 (holding the contractor/owner of a newly-constructed home with substantial defects in the installation of the hardwood floor and windows liable under the UTPCPL for misleading the buyers "into believing that errors in their home would be corrected by promising a builder's warranty," and then failing to correct the errors and disregarding the warranty); *Krishnan v. Cutler Grp., Inc.*, 171 A.3d 856, 896 (Pa. Super. 2017) (affirming judgment against the contractor/owner of a newly-constructed home who had "guaranteed and warranted a home built in

_____

[14] Samuel's later act of sending the letter did not induce reliance by Buyers; by that point, they had already instituted litigation. But the letter reinforced the earlier representations that the LLC Sellers warranted their work pursuant to a new construction warranty.

accordance with a certain standard," but when leaks developed, he failed to honor the guarantee and warranty and instead engaged in "ineffective, superficial remedies which failed to provide [the buyers] with the [h]ome they were promised").

As for Samuel's argument concerning the award of damages, having not presented evidence "contradicting or refuting" the amount of actual damages at trial, he cannot dispute the award of actual damages on appeal. *See Sereda*, 222 A.3d at 1172. Samuel provides no specificity as to why he contends the damages are excessive beyond the proportionality to the actual damage award. The UTPCPL expressly authorizes a trial court to award, in its discretion, up to and including treble damages, "additional relief as it deems necessary or proper," and plaintiff's costs and reasonable attorneys' fees. *See* 73 P.S. § 201-9.2(a); *see also Krishnan v. Cutler Grp., Inc.*, 171 A.3d 856, 872 (Pa. Super. 2017) (affirming trial court's reasonable exercise of discretion in awarding attorneys' fees and expert fees). Thus, the trial court's award of attorneys' fees of $75,000, and double damages of $70,500, in excess of Buyers' actual damages of $70,500, was within its discretion.

**Newly-Discovered Evidence**

Samuel next claims that he has procured newly discovered evidence that directly refutes Buyers' claims that he made representations to the Buyers: a "sworn statement" by Toll "confirm[s] that [Samuel] had no role in negotiations, representations, or post-sale issues." Samuel's Brief at 4.

- 37 -

Samuel asserts that this newly discovered evidence requires reversal of the judgment against him.

Samuel raised this "newly discovered evidence" for the first time in his concise statement. *See* Trial Court Opinion, 12/6/2024, at 9; Samuel's Concise Statement at 3. A party cannot fail to present evidence at trial and attempt to cure the failure after the trial is over. *See Claudio v. Dean Mach. Co.*, 831 A.2d 140, 145 (Pa. 2003). The very limited exception to such rule is after-discovered evidence:

> [A]fter-discovered evidence, to justify a new trial, must have been discovered after the trial, be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result. ... A court should not grant a new trial based on after-discovered evidence unless the proponent can convincingly show that he was unable to obtain such testimony for the trial by use of reasonable diligence.

*Drake Mfg. Co. v. Polyflow, Inc.*, 109 A.3d 250, 262 (Pa. Super. 2015) (quoting *Claudio*, 831 A.2d at 145). Toll was not unknown to Samuel; Samuel testified that Toll was a realtor obtained by the LLC Sellers working on behalf of the entities to sell the Home. N.T., 9/27/2023, at 90, 96, 136. Samuel makes no effort to demonstrate why he could not have introduced testimony by Toll at trial. No relief is due.

## Conclusion

As detailed above, while the trial court erred in determining that Samuel was liable to Buyers under the participation theory, the trial court did not err by piercing the corporate veil of Odagbodo LLC under an alter ego theory,

determining that Samuel was strictly liable for an unfair trade practice under the UTPCPL's catch-all provision, and by awarding double damages and attorneys' fees under the UTPCPL. Additionally, Samuel has not established that the affidavit of Toll satisfies the requirements for after-discovered evidence. Accordingly, we affirm the judgment entered against him in his individual capacity.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2025